846 So.2d 440 (2003)
Jonathan Huey LAWRENCE, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-1827.
Supreme Court of Florida.
March 20, 2003.
Rehearing Denied May 14, 2003.
*442 Nancy A. Daniels, Public Defender, Chet Kaufman and David A. Davis, Assistant Public Defenders, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Charles J. Crist, Jr., Attorney General and Stephen R. White, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal Jonathan Huey Lawrence's sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm.

FACTS
On March 24, 2000, Lawrence pled guilty to principal to first-degree murder of Jennifer Robinson, conspiracy to commit first-degree murder, giving alcoholic beverages to a person under twenty-one, and abuse of a dead human corpse. Lawrence's codefendant, Jeremiah Martel Rodgers, picked up eighteen-year-old Jennifer Robinson from her mother's home on May 7, 1998. Rodgers and Robinson met Lawrence, and all three drove in Lawrence's truck to a secluded area in the woods. After imbibing alcoholic beverages, Robinson had sex with Rodgers and then with Lawrence. At some point thereafter, Rodgers shot Robinson in the back of the head using Lawrence's Lorcin .380 handgun.[1] The gunshot rendered Robinson *443 instantly unconscious, and she died minutes later. Lawrence and Rodgers loaded Robinson's body into Lawrence's truck and drove further into the woods. Lawrence made an incision into Robinson's leg and removed her calf muscle. Rodgers took Polaroid pictures of the body, including a picture of Lawrence's hand holding Robinson's foot. Lawrence and Rodgers buried Robinson at that site.
Investigators traced Robinson's disappearance to Lawrence and Rodgers. When confronted by Investigator Todd Hand, Lawrence denied knowing Robinson and consented to Hand's request to search Lawrence's trailer and truck. After recovering multiple notes written by Lawrence and Polaroid photographs depicting Robinson post-mortem, Hand arrested Lawrence. One page of the recovered notes states in part: "get her very drunk," "yell in her ears to check consicouse [sic]," "even slap hard," "[r]ape many, many, many times," "`slice and dice,' [d]isect [sic] completely," "bag up eatabile [sic] meats," and "bag remains and bury and burn." Another page of notes provides a list of items and tasks, some of which had been checked off or scribbled out. That list includes "coolers of ice = for new meat," strawberry wine, everclear alcohol, scalpels, Polaroid film, and ".380 or-and bowies [knives]." Other items located by investigators during their search of Lawrence's trailer and truck included a box for a Lorcin .380 handgun; empty Polaroid film packages; a piece of human tissue in Lawrence's freezer; a blue and white ice chest; an empty plastic ice bag; disposable gloves; a scrapbook; and several books, including an anatomy book entitled The Incredible Machine, within which had been marked female anatomy pages and pen lines drawn at the calf section of a leg. Lawrence subsequently confessed to his involvement, after waiving his Miranda[2] rights, and led detectives to Robinson's body.
At Lawrence's penalty phase before a jury, the State introduced evidence of Lawrence's prior violent crimes[3] and argued *444 that the murder was committed in a cold, calculated, and premeditated manner (CCP). The State also introduced Lawrence's tape-recorded confession. Lawrence called witnesses who testified about Lawrence's disturbed childhood and his mental capacity.[4] The jury recommended death by a vote of eleven to one.
The trial court accepted additional evidence and testimony at the Spencer hearing[5] and then followed the jury's recommendation and imposed a death sentence. The trial court found two aggravating circumstances: (1) Lawrence was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (great weight); and (2) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (great weight).[6] *445 The trial court found five statutory mitigating circumstances: (1) the capital felony was committed while Lawrence was under the influence of extreme mental or emotional disturbance (considerable weight); (2) the capacity of Lawrence to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (considerable weight); (3) the age of Lawrence (twenty-three years) at the time of the crime (some weight); (4) Lawrence's caring and giving relationship to his family, especially his mother, (little weight); and (5) the sick and disturbed home life in which Lawrence was raised (considerable weight).[7] The trial court also found four nonstatutory mitigating circumstances.[8]See State v. Lawrence, No. 98-270-CFA (Fla. 1st Cir. Ct. order filed Aug. 15, 2000) (hereinafter sentencing order).
Regarding the statutory mental mitigators, the trial court found:
[Lawrence] presented the testimony of three experts: Dr. Frank Wood, a neuropsychologist, Dr. Barry Crown, a licensed psychologist, and Dr. Robert Napier, a licensed psychologist.
....
The uncontroverted expert opinions along with other evidence in the record demonstrate that [Lawrence] has organic brain damage and a substantial history of mental health problems. He does suffer from a mental or emotional disturbance and was under the influence of this disturbance at the time of this crime. This mental or emotional disturbance influenced Lawrence or his behavior during the criminal episode. However, the entirety of the evidence diminishes the substantiality of the influence. See Foster v. State, 679 So.2d 747, 755 (Fla.1996) (stating "[e]ven uncontroverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence presented in this case.") (citing Wuornos v. State, 644 So.2d 1000, 1010 (Fla. 1994)).[n.]
[n.]7. When the entire evidence presented is viewed in toto, this Court is convinced Lawrence's capacity to appreciate the criminality of his conduct or his ability to conform his conduct to the requirements of the law was impaired, but seriously questions *446 if the impairment was relatively substantial. Lawrence obviously has both cognitive and volitional deficiencies. He is mentally and emotionally disturbed. Nonetheless, he clearly has the ability to appreciate the criminality of his conduct and, when he decides to do so, conforms his conduct to the requirements of the law. As brought out in Dr. Wood's testimony, the vast majority of people who suffer schizophrenia do not commit murder and those who do often suffer hallucinations or delusions not competently evidenced in this case. There was no competent, substantial evidence [that Lawrence] experienced delusional thinking or perceptual disturbances.... In sum, Lawrence's criminality appears to be more substantively a product of his intrinsic or moral makeup (i.e., his character, his values, the "habits of his heart" to use the phraseology of Alex De Touqville) than the result of an overriding mental or emotional impairment.
....
To summarize, Lawrence was able to establish the existence of these two mental mitigators. He was under the influence of extreme mental or emotional disturbance. However, he failed to establish that any auditory hallucinations had any causal relationship with this crime nor was there any evidence of delusional thinking. Thus, the influence of his mental disturbance was significant but not predominant. Likewise, Lawrence's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, but this impairment was not a predominant factor. Despite the presence of both mental mitigators, there is not a predominant causal connection or relationship between Lawrence's mental or emotional disturbances and this senseless murder. Lawrence faced these mental issues on a daily basis for years. Despite his mental disturbance, Lawrence was somewhat self-sufficient and capable of loving those he chose to love. Though significantly impaired, he had the ability to appreciate the criminality of his conduct and to conform his conduct to these requirements of law.
Sentencing order at 9-10, 12-13 (some alterations in original) (footnote omitted).
Lawrence appeals the trial court's sentence of death, raising seven issues.[9]

ISSUE 1. FAILURE TO ORDER A COMPETENCY HEARING
Lawrence claims that the trial court erred by failing to appoint mental health experts and order an evidentiary competency hearing during the trial. While a State witness was explaining photographs depicting the discovery of Robinson's body, Lawrence's attorney informed the trial court that Lawrence reported having hallucinations and flashbacks. After a break, Lawrence's counsel indicated that Lawrence was prepared to proceed, and the penalty phase resumed. Subsequently, during the playing of one of Lawrence's recorded statements, Lawrence's counsel *447 again informed the trial court that Lawrence indicated he was experiencing hallucinations. The trial court took a break, engaged in a colloquy with Lawrence, and allowed Lawrence to leave the courtroom while his recorded statements were played. No competency hearing was requested. Lawrence asserts in this appeal that the trial court was constitutionally required to order an evidentiary hearing.
Decisions regarding competency, including whether a defendant need be given a competency hearing after previously being declared competent to proceed, are within the sound discretion of the trial court. See Bryant v. State, 785 So.2d 422, 427 (Fla.2001); Hunter v. State, 660 So.2d 244, 248 (Fla.1995) ("Once a defendant is declared competent ... only if bona fide doubt is raised as to a defendant's mental capacity is the court required to conduct another competency proceeding."). A trial court's decision regarding whether to hold a competency hearing will be upheld absent an abuse of discretion. See Hunter, 660 So.2d at 247.[10] In the instant case, the trial court did not abuse its discretion by not conducting a competency hearing during the penalty phase.
Prior to trial, Lawrence's counsel made several motions to appoint experts to evaluate Lawrence for competency to stand trial. The trial court granted the motions. Those experts did not, however, evaluate Lawrence, because Lawrence decided to offer the guilty plea. Prior to the plea colloquy, the trial court asked Lawrence's counsel, "Are you satisfied that given [Lawrence's] current mental situation and any psychological issues there may be that he understands the very serious nature and consequences of this decision [to plead guilty]?" Lawrence's counsel answered:
Yes, judge. We addressed that in our private consultation with him on the video. And I inquired of him if he was having any hallucinations, either auditory or visual, and having anything to do with his decision to enter a plea of guilty. And he did not. He is not on any medication.
We do recognize that our mitigation will establish that there is some problem with his judgment and his ability to reason and think. But we think that he has the capacity to appreciate the effect of his guilty plea upon the penalty phase of the proceeding.
Lawrence's counsel further stated, "We'll point out that [Lawrence] was evaluated sometime back by Dr. Larson and Dr. Bingham and found competent to proceed." The trial court then engaged Lawrence in an extensive plea colloquy, wherein Lawrence answered the court's questions and informed the court that the decision to plead guilty was his decision.
When Lawrence later displayed signs of discomfort in the courtroom, the trial court stopped the proceedings and discussed the matter with both Lawrence's counsel and Lawrence. Lawrence's counsel never requested a competency hearing during the penalty phase and gave all indications that Lawrence was competent to stand trial. Cf. Kilgore v. State, 688 So.2d 895, 899 (Fla.1996) (finding trial court did not err by not holding competency hearing where defense counsel did not request a hearing and defendant had previously been declared *448 competent). The trial judge then thoroughly questioned Lawrence about the nature of the hallucinations and flashbacks. After speaking with Lawrence, the trial court determined that Lawrence was simply uncomfortable hearing certain portions of the evidence. Lawrence has failed to demonstrate that, under these circumstances, the trial court abused its discretion by proceeding with the penalty phase without giving Lawrence a competency hearing.

ISSUE 2. SUBSTANTIAL DOMINATION MITIGATOR
Regarding the substantial domination mitigator, the trial court's written findings state in pertinent part:
Although the experts suggest Lawrence is easily led, Lawrence failed to establish that Rodgers substantially dominated him or that he acted under extreme duress. Other than Lawrence's self-serving confession, the record does not contain any direct evidence that Rodgers dominated Lawrence or that Lawrence's participation in the crime was minor. As discussed in the cold, calculated, and premeditated section, the evidence demonstrates that Lawrence's involvement was anything but minor. His involvement was significant. Lawrence participated in all phases of the murder: the planning, the preparation, the implementation of the plan, and the concealment of the crime.
The following details particularly demonstrate Lawrence's involvement in Jennifer Robinson's murder: Lawrence wrote the notes after he had been involved in two other violent crimes with Rodgers; Lawrence furnished the murder weapon as well as the majority of the items used in the murder; Lawrence was more familiar with the remote areas of Santa Rosa County; and Lawrence never withdrew his assistance even after the murder had been committed.
Although Lawrence indicates in his taped confession that he wrote the note at Rodgers' direction, he continually contradicts this implication with his extensive use of the term "we." In fact, Rodgers' and Lawrence's collaboration is best illustrated with the following statement: "[y]eah, he'd just tell me just bad things to write down. I'd think of a few and write stuff down." In addition, one of the instructions on the notes is "get Jereimaih [Jeremiah] to make phone calls." This statement does not appear to be written at Rodgers' instruction nor is it characteristic of a dominant/submissive relationship.
At the Spencer hearing, the State presented additional evidence that supports Lawrence's active involvement. A footlocker at Lawrence's residence contained numerous books as well as a scrapbook. These items are very telling. Among the books found were: (1) William Powell, The Anarchist Cookbook, Barricade Books, Inc. (1971); (2) The Editors of Time-Life Books, Serial Killers, Time-Life Books (1992) which contains pictorial essays on Ted Bundy, John Wayne Gacy, David Berkowitz and Dennis Nilsen; and (3) Five books about snipers including Maj. John L. Plaster, The Ultimate Sniper: An Advanced Training Manual For Military & Police Snipers, Paladin Press (1993) and J. David Truby, Silencers, Snipers & Assassins: An Overview of Whispering Death, Paladin Press (1972).
The scrapbook contained various items that included: his GED certificate, karate certificate, numerous articles on the Ku Klux Klan and serial killers. Many of the items date back several years prior to Lawrence's involvement with Rodgers. The certification of Lawrence's *449 "Citizenship" in the American Knights of the Ku Klux Klan is dated February 23, 1998, a month before the attempted murder of Layton Smitherman. Rodgers did not arrive in Pace until March 1998.
The books and the scrapbook reveal Lawrence's interests and support the State's contention that he would have actively participated in the murder. The State also introduced into evidence the human body book, The Incredible Machine, which was recovered from the toolbox on [Lawrence's] truck. Several sections in this book were marked with a pen including a picture of the muscle structure of a female body with the calf section marked. The possession of this book, along with the other evidence (e.g., admission that he cut the leg and the calf muscle was found in his freezer), indicate that Lawrence initiated and carried out this aspect of the plan.
Regardless of who was the leader, the evidence demonstrates that Lawrence's involvement was active, significant and voluntary. He was a major participant, not a minor accomplice. There is insufficient evidence to establish [that] Mr. Rodgers substantially dominated Lawrence or that he was under extreme duress. Therefore, Lawrence has failed to establish by the greater weight of the evidence the presence of these two mitigators.
Sentencing order at 14-16 (citations and footnotes omitted.)
Lawrence claims that the trial court erroneously excluded evidence of Rodgers' criminal history and then erroneously refused to find the statutory mitigator that Lawrence may have been acting under the substantial domination of Rodgers. The trial court found that Rodgers' National Crime Information Center (NCIC) record was not relevant because there was no evidence to establish that Lawrence had knowledge of Rodgers' record prior to the instant crime. Lawrence argues that this refusal imposed on Lawrence a "Hobson's choice" of having to forfeit his right not to testify in exchange for presenting evidence to support his claim of mitigation.
We, however, do not find support in the record for Lawrence's contentions. There was no evidence presented or proffered indicating how Rodgers' record influenced Lawrence's behavior in the instant crime. While Lawrence argued to the trial court that the time Lawrence and Rodgers spent together in a mental hospital suggested that Lawrence knew the substance of Rodgers' record, no evidence was presented or proffered to further this assertion. The mere possibility that Lawrence might have been able to establish this foundation through his own testimony does not create a constitutional infirmity. See State v. Raydo, 713 So.2d 996, 1000 (Fla.1998). Moreover, if the trial court erred in excluding Rodgers' record, that error was harmless given the extensive evidence in the record regarding Rodgers' history with Lawrence. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).
Regarding the trial court's finding that the substantial domination mitigator was not established by the evidence, we find that there is competent, substantial evidence to support the trial court's finding. While Lawrence's witnesses opined that Lawrence had the propensity to be a follower, there is no evidence establishing that Lawrence was dominated by Rodgers. Lawrence provides no evidence that Rodgers threatened him, coerced him, or intimidated him in any way. There is evidence that Lawrence wrote the notes planning the murder, that he purchased or acquired the items used during the murder, and that he directly assisted in concealing Robinson's *450 body. The trial court noted that Lawrence was a major participant rather than a minor accomplice. Thus, we deny Lawrence's claim. Cf. San Martin v. State, 705 So.2d 1337, 1348 (Fla.1997); Valdes v. State, 626 So.2d 1316, 1324 (Fla. 1993).

ISSUE 3. COLD, CALCULATED, AND PREMEDITATED AGGRAVATOR
Lawrence asserts that the trial court erroneously found the CCP aggravator. "A trial court's ruling on an aggravating circumstance will be sustained on review as long as the trial court applied the right rule of law and its ruling is supported by competent substantial evidence in the record." Gore v. State, 784 So.2d 418, 432 (Fla.2001). We hold that the trial court did not err in finding the CCP aggravator.
To prove the CCP aggravator, "the State must show a heightened level of premeditation establishing that the defendant had a careful plan or prearranged design to kill." Bell v. State, 699 So.2d 674, 677 (Fla.1997). Lawrence's confession regarding the Robinson murder, combined with the notes describing the planning of the murder as written by Lawrence, constitute competent, substantial evidence in the record that (1) the murder was the product of Lawrence's cool and calm reflection; (2) there was a careful plan or prearranged design to commit murder before the fatal incident; (3) Lawrence had heightened premeditation; and (4) there was no pretense of moral or legal justification for the murder. See Hoskins v. State, 702 So.2d 202, 210 (Fla.1997). The trial court's sentencing order clearly states and applies the correct rule of law for establishing the CCP aggravator, and sets forth the extensive factual information supporting that aggravator. See sentencing order at 3-8. Moreover, this Court has upheld findings of CCP aggravators in cases where the defendants were not the actual shooters. See, e.g., Ferrell v. State, 686 So.2d 1324, 1330 (Fla.1996); Archer v. State, 673 So.2d 17, 20 (Fla.1996); see also San Martin, 705 So.2d at 1349 ("The fact that the plan called for [San Martin's codefendant] to shoot the victim does not negate the CCP aggravator as to San Martin.").

ISSUE 4. SENTENCING ORDER DEFECTS
Lawrence claims that the trial court committed reversible error by including non-record facts in its aggravation findings and by ambiguously assigning weight to the age mitigator. Specifically, the trial court alludes in a footnote to the fact that Rodgers has claimed that Lawrence was the shooter, see sentencing order at 4 n. 2, while the undisputed facts of this record indicate that Lawrence was not the actual killer. Lawrence also challenges the trial court's description of the attempted murder of Smitherman, in that the trial court said: "Rodgers and [Lawrence] had been driving around that evening looking ... to find somebody to shoot and kill." Id. at 3. Regarding the age mitigator, Lawrence states that the trial court ambiguously assigned weight, saying orally that the mitigator got "little weight" while writing in the sentencing order that the mitigator got "some weight." Id. at 16.
Although the trial court should not have included in the footnote facts which were not from the record of this case, see Kormondy v. State, 703 So.2d 454, 463 (Fla.1997) ("[I]t is crucial that a sentencing order only reflect facts drawn from the record in the particular case."), those statements are clearly harmless beyond a reasonable doubt. The trial judge expressly accepted that Rodgers was the *451 shooter, and there is overwhelming evidence supporting the prior violent felony aggravator. See Consalvo v. State, 697 So.2d 805, 818 (Fla.1997); Lockhart v. State, 655 So.2d 69, 74 (Fla.1995). Similarly, any error that the trial court made in orally pronouncing the weight given to the age mitigator was harmless beyond a reasonable doubt. See DiGuilio, 491 So.2d at 1135. The cumulative effect of these errors does not render the sentencing order unreliable. See id.

ISSUE 5. CONSTITUTIONALITY OF THE DEATH PENALTY
Lawrence raises numerous constitutional challenges to the death penalty, including the claim that the imposition of the death penalty violates Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This Court addressed similar arguments in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), cert. denied, ___ U.S. ____, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.2002), cert. denied, ___ U.S. ____, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. We find that Lawrence is likewise not entitled to relief on this claim. We further deny Lawrence's blanket claims that Florida's death penalty statute violates Florida, federal, and international law. See San Martin, 705 So.2d at 1350 (rejecting argument "that the death penalty is unconstitutional both facially and as applied").

ISSUE 6. INVESTIGATOR HAND'S TESTIMONY
Lawrence asserts in his supplemental briefing that the trial court committed reversible error by overruling Lawrence's objection to Investigator Hand giving his opinion regarding Lawrence's alter ego and by denying Lawrence's motion for a mistrial. This Court reviews evidentiary rulings and denials of motions for mistrial under an abuse-of-discretion standard. See Ray v. State, 755 So.2d 604, 610 (Fla.2000); Cole v. State, 701 So.2d 845, 853 (Fla.1997). The trial court did not abuse its discretion in this case.
Lawrence's counsel extensively argued to the trial court that Hand should be able to give his opinion as to whether Lawrence was a follower or a leader. Lawrence's counsel contended that "the rules of evidence are relaxed; and this opinion is one that he is eminently ... qualified to make as a detective." The trial judge eventually ruled that he would "[err] on the side of caution" and allow Lawrence's counsel to ask Hand for his opinion. Defense counsel further assured the trial court that Hand was qualified to give this type of opinion.
When Hand testified, Lawrence's counsel specifically asked Hand to state his opinion as to who was the dominant person between Lawrence and Rodgers. Hand testified that Lawrence could be considered a follower in a public setting. During the State's cross-examination, Hand testified that Lawrence was more open and outgoing when in the presence of Rodgers. On redirect examination, Lawrence's counsel asked Hand if he recalled making a prior statement regarding Hand's belief that Lawrence had an alter ego of which Rodgers took advantage. Hand replied: "I recall that in detail but." Lawrence's counsel then interrupted Hand, and the State objected to Lawrence's counsel not allowing Hand to finish his statement. The trial court allowed Lawrence's counsel to continue and stated that the State could ask Hand to explain further on recross-examination. On recross-examination, the State asked Hand to explain what he was going to say when he was previously interrupted. Lawrence's counsel objected, stating that Hand was not qualified to answer the question. The trial court overruled *452 the objection, and Hand testified that he believed that when Lawrence was with Rodgers, Lawrence "becomes the person that he wanted to be, he always wanted to be and couldn't be in society." Based on that testimony, Lawrence's counsel made a motion for a mistrial, which was denied by the trial court.
In view of the manner in which Hand's testimony was initially presented by Lawrence's counsel, we do not find error in the trial court's rulings regarding the recross-examination of Hand. In Rodriguez v. State, 753 So.2d 29 (Fla.2000), this Court stated: "As an evidentiary principle, the concept of `opening the door' allows the admission of otherwise inadmissible testimony to `qualify, explain, or limit' testimony or evidence previously admitted. The concept of `opening the door' is `based on considerations of fairness and the truth-seeking function of a trial.'" Id. at 42 (citations omitted). Without Hand's explanation on recross-examination, Hand's opinion would have been incomplete and misleading. The trial court, therefore, did not abuse its discretion in allowing the recross-examination and denying Lawrence's motion for a mistrial. Cf. Wuornos v. State, 644 So.2d 1012, 1018 (Fla.1994) ("Defense counsel opened the door and will not be heard to complain now.").

ISSUE 7. PROPORTIONALITY
The final issue we here consider is the issue of proportionality. In Bates v. State, 750 So.2d 6, 12 (Fla.1999), this Court stated:
Our function in a proportionality review is not to reweigh the mitigating factors against the aggravating factors. As we recognized in our first opinion in this case, that is the function of the trial judge. Rather, the purpose of proportionality review is to consider the totality of the circumstances in a case and compare it with other capital cases. For purposes of proportionality review, we accept the jury's recommendation and the trial judge's weighing of the aggravating and mitigating evidence.
(Citations omitted.) We have likewise said that proportionality "is not a comparison between the number of aggravating and mitigating circumstances; rather, it is a `thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it with other capital cases.'" Beasley v. State, 774 So.2d 649, 673 (Fla.2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990)).
Additionally, we stated in Dixon v. State, 283 So.2d 1, 7 (Fla.1973):
Death is a unique punishment in its finality and in its total rejection of the possibility of rehabilitation. It is proper, therefore, that the Legislature has chosen to reserve its application to only the most aggravated and unmitigated of most serious crimes. In so doing, the Legislature has also recognized the inability of man to predict the myriad tortuous paths which criminality can choose to follow. If such a prediction could be made, the Legislature could have merely programmed a judicial computer with all of the possible aggravating factors and all of the possible mitigating factors includedwith ranges of possible impact of eachand provided for the imposition of death under certain circumstances, and for the imposition of a life sentence under other circumstances. However, such a computer could never be fully programmed for every possible situation, and computer justice is, therefore, an impossibility. The Legislature has, instead, provided a system whereby the possible aggravating and mitigating circumstances are defined, but where the weighing process is left to the carefully *453 scrutinized judgment of jurors and judges.
We have followed Dixon by stating that the death penalty is "reserved for only the most aggravated and least mitigated of first-degree murders." Urbin v. State, 714 So.2d 411, 416 (Fla.1998).
The sentencing order in this case found extensive aggravating circumstances and substantial mitigating circumstances. The trial judge properly weighed these circumstances and determined that the jury's death recommendation should be followed. The trial judge's sentencing order offered the following summary of his findings:
The Court has carefully considered and weighed the aggravating circumstances found to exist in this case. The State has proven beyond and to the exclusion of every reasonable doubt the existence of two serious aggravators. The prior violent felony aggravator was given great weight due to the fact that both prior offenses were committed prior to the murder of Jennifer Robinson, were committed with the co-defendant, Rodgers, and involved murder and attempted murder. Both of these prior crimes were senselessly violent and without any moral or legal justification. They are indicative of the same total disregard for human life evidenced in this case. In each case, Lawrence and Rodgers killed or attempted to kill another human being for the sheer excitement or depraved enjoyment of the act. In addition, the cold, calculated, and premeditated aggravator was given great weight due to [Lawrence's] significant involvement in the planning, preparation, and execution of the murder.
In weighing the aggravating factors against the mitigating factors, this Court understands the process is not simply arithmetic. It is not enough to weigh the number of aggravators against the number of mitigators. The process is more qualitative than quantitative. The Court must and did look to the nature and quality of the aggravators and mitigators that it has found to exist.
The Court finds, as did the jury, that these two aggravators greatly outweigh all of the statutory and non-statutory mitigating circumstances, inclusive of the significant mental mitigation.
Sentencing order at 19-20 (citations omitted). In comparing the particular circumstances of the instant case with other cases which have had similar aggravation and mitigation, we determine that Lawrence's death sentence is proportionate.
This Court has upheld sentences of death in several cases involving aggravating and mitigating circumstances similar to those found in the instant case. In Robinson v. State, 761 So.2d 269, 272-73 (Fla.1999), this Court reviewed a trial court's imposition of a death sentence on a defendant who had been convicted of murdering an acquaintance in order to obtain money for drugs. The trial court found three aggravating factors: "(1) the murder was committed for pecuniary gain; (2) the murder was committed to avoid arrest; and (3) the murder was cold, calculated and premeditated." Id. The trial court found two statutory mitigating factors: "(1) Robinson suffered from extreme emotional distress (some weight); and (2) Robinson's ability to conform his conduct to the requirements of the law was substantially impaired due to history of excessive drug use (great weight)." Id. at 273. The trial court also found eighteen nonstatutory mitigators:
(1) Robinson had suffered brain damage to his frontal lobe (given little weight because of insufficient evidence that brain damage caused Robinson's conduct); (2) Robinson was under the influence *454 of cocaine at the time of murder (discounted as duplicative because cocaine abuse was considered in statutory mitigators); (3) Robinson felt remorse (little weight); (4) Robinson believed in God (given little weight); (5) Robinson's father was an alcoholic (given some weight); (6) Robinson's father verbally abused family members (given slight weight); (7) Robinson suffered from personality disorders (given between some and great weight); (8) Robinson was an emotionally disturbed child, who was diagnosed with ADD, placed on high doses of Ritalin, and placed in special education classes, changed schools five times in five years, and had difficulty making friends (given considerable weight); (9) Robinson's family had a history of mental health problems (given some weight); (10) Robinson obtained a G.E.D. while in a juvenile facility (given minuscule weight); (11) Robinson was a model inmate (given very little weight); (12) Robinson suffered extreme duress based on fear of returning to prison because where he was previously raped and beaten (given some weight); (13) Robinson confessed to the murder and assisted police (given little weight); (14) Robinson admitted several times to having a drug problem and sought counseling (given no additional weight to that already given for history of drug abuse); (15) the justice system failed to provide requisite intervention (given no additional weight to that already given for history of drug abuse); (16) Robinson successfully completed a sentence and parole in Missouri (given minuscule weight); (17) Robinson had the ability to adjust to prison life (given very little weight); and (18) Robinson had people who loved him (given extremely little weight).
Id. This Court upheld Robinson's death sentence because the totality of the circumstances indicated that Robinson was capable of functioning in everyday society and that he "acted according to a deliberate plan and was fully cognizant of his actions." Id. at 278.
In Smithers v. State, 826 So.2d 916, 931 (Fla.2002), this Court reviewed a trial court's imposition of two death sentences on a defendant who had been convicted of murdering two women and then disposing of their bodies in a pond. The trial court found two aggravating factors for the murder of the first victim: (1) previous violent felony (contemporaneous murder); and (2) the murder was especially heinous, atrocious, or cruel (HAC). The trial court found three aggravating factors for the murder of the second victim: (1) previous violent felony (contemporaneous murder); (2) HAC; and (3) CCP. This Court detailed the mitigation found by the trial court which related to both murders:
The trial court found the following two statutory mitigators: (1) the murder was committed while Smithers was under the influence of extreme mental or emotional disturbance (moderate weight) and (2) Smithers' capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired (moderate weight). The trial court also found the following nonstatutory mitigators: (1) Smithers was a good husband and father, (2) Smithers enjoyed a close relationship with his siblings, (3) Smithers was physically and emotionally abused by his mother as a child, (4) Smithers regularly attended church and was devoted religiously, (5) since being arrested, Smithers has been a model inmate and he would conduct himself appropriately in a prison setting, (6) Smithers has made several contributions to the community, and (7) Smithers confessed to the crime, but his trial testimony is in *455 conflict with his statements to the detectives. All of the nonstatutory mitigators were given moderate weight. Finally, the court considered the statements of John Cowan ([second victim's] father), who requested that Smithers be given a life sentence. This was given great weight by the trial court.
Smithers, 826 So.2d at 931. This Court found both of Smithers' death sentences proportionate. Id.
Additionally, this Court has upheld death sentences in other analogous cases where extensive aggravating circumstances outweighed substantial mitigating circumstances. Cf. Chavez v. State, 832 So.2d 730 (Fla.2002); Zakrzewski v. State, 717 So.2d 488, 494 (Fla.1998); Gudinas v. State, 693 So.2d 953, 968 (Fla.1997); Rolling v. State, 695 So.2d 278, 297 (Fla.1997); Pope v. State, 679 So.2d 710, 716 (Fla. 1996); Henyard v. State, 689 So.2d 239, 255 (Fla.1996); Branch v. State, 685 So.2d 1250, 1253 (Fla.1996); Spencer v. State, 691 So.2d 1062, 1065 (Fla.1996); Provenzano v. State, 497 So.2d 1177, 1183-84 (Fla. 1986).
In the instant case, the trial court found that despite the existence of mental mitigation, Lawrence was capable of functioning in society, he could comprehend the consequences of his actions, and he acted with a deliberate plan to further his own gruesome personal interests. Moreover, the jury recommended death by a vote of eleven to one, and the trial court accorded great weight to the two extremely serious aggravating circumstances (prior violent felonies and CCP). The trial court only gave considerable weight to the statutory mental mitigators and explained the factual reasons for their diminished weight in the sentencing order. See sentencing order at 10-13. The other statutory and nonstatutory mitigators were accorded similar or less weight. We find that the death sentence in the instant case is proportionate to Robinson, given the trial court's findings that Lawrence's mental impairments did not deprive him of self-control and that Lawrence followed a deliberate plan to murder the victim. Cf. Robinson, 761 So.2d at 273.
The instant case is also proportionate to Smithers, which involved similar facts and similar aggravating and mitigating circumstances. In both the instant case and Smithers, either the HAC or CCP aggravators were found, and both are considered extremely serious aggravators. See Larkins v. State, 739 So.2d 90, 95 (Fla. 1999) ("[HAC and CCP] are two of the most serious aggravators set out in the statutory sentencing scheme...."). Although the instant case is distinguishable from Smithers, in that Lawrence did not actually commit the instant murder,[11] the prior violent felony aggravator in the instant case is arguably more serious than the same aggravator in Smithers, given Lawrence's multiple convictions of murder and principal to attempted first-degree murder, which occurred over a period of months. Therefore, the aggravating circumstances in the instant case are stronger than those found in Smithers. Additionally, the trial court in the instant case found that Lawrence's mental impairments were diminished by other evidence in this case. Thus, Lawrence's death sentence is proportionate.[12]

*456 CONCLUSION
Accordingly, we affirm Lawrence's sentence of death.
It is so ordered.
WELLS, LEWIS and QUINCE, JJ., and HARDING, Senior Justice, concur.
PARIENTE, J., concurs in result only with an opinion, in which SHAW, Senior Justice, concurs.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
PARIENTE, J., concurring in result only.
I concur in the affirmance of the death sentence in this direct appeal because one of the aggravating circumstances found by the trial court was a prior violent felony conviction, based on a contemporaneous kidnapping. Therefore, Lawrence is not entitled to relief under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), or Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).[13] I concur in result only because in my view neither Bottoson v. Moore, 833 So.2d 693 (Fla.2002), nor King v. Moore, 831 So.2d 143 (Fla.2002), directly control the outcome of this direct appeal challenge to the constitutionality of Florida's death penalty statute in light of Ring. I would not reach the broader issue of the constitutionality of Florida's death penalty statute in light of Ring in this case; however, in my view, but for the prior violent felony conviction aggravator, this case would present constitutional concerns in light of Ring. The eleven-to-one vote on the advisory sentence may very well violate the constitutional right to a unanimous jury in light of the holding in Ring that the jury is the finder of fact on aggravating circumstances that qualify the defendant for the death penalty. See Anderson v. State, 841 *457 So.2d 390 (Fla. 2003) (Pariente, J., concurring as to conviction and concurring in result only as to sentence).
SHAW, Senior Justice, concurs.
ANSTEAD, C.J., concurring in part and dissenting in part.
I concur in the majority's opinion in all respects except for the discussion and resolution of the Ring issue.
NOTES
[1] The trial court below accepted, and the State did not attempt to refute, Lawrence's assertion that Rodgers actually killed Robinson by shooting her in the back of the head. On November 21, 2000, Rodgers was sentenced to death in a separate proceeding for being a principal to the first-degree murder of Robinson.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The trial court's sentencing order details the facts of Lawrence's prior violent crimes:

On June 17, 1999, [Lawrence] pled guilty in Federal Court to the capital felony crime of Murder in United States v. Lawrence, Case Number 3:98CR00073-001....
On April 9, 1998, Rodgers, Jonathan Lawrence and Lawrence's cousin, Justin Livingston, were all at Lawrence's trailer. The three men left the trailer in Lawrence's truck to ride around. According to Lawrence, Rodgers induced Livingston to ride with them under the pretense of smoking marijuana. After arriving at a remote location, the men exited the vehicle. Both Lawrence and Rodgers surreptitiously retrieved knives from the toolbox of the Defendant's truck. Lawrence stated that Rodgers first stabbed the victim twice in the chest area and then attempted to strangle him. While Justin Livingston lay facedown, wounded and pleading for mercy, his cousin, Jonathan Lawrence, stabbed him in the back at least four times. Lawrence and Rodgers loaded the body in his truck and buried it at another location.
Secondly, on March 27, 2000, [Lawrence] entered a plea of nolo contendere before this Court to an earlier crime of Principal to First Degree Attempted Murder. This Court adjudicated [Lawrence] guilty in State v. Lawrence, Case Number 98-321. On March 29, 1998 (eleven days before the murder of Justin Livingston) the elderly victim in this case, Layton [sic] Smitherman, was shot in the back while quietly sitting in his living room chair watching the evening movie with his wife and adult daughter. Mr. Smitherman did not know either defendant or of any grudge or dispute they might have with him. The bullet casing found outside the Smitherman residence was fired from the Defendant's Lorcin 380 handgun later used to kill Jennifer Robinson. The Defendant admitted to law enforcement that both Jeremiah Rodgers and he had been driving around that evening looking to get into trouble, preferably to find somebody to shoot and kill. The Defendant drove his truck by the Smitherman home. They had found their target. Lawrence pulled the truck off to a secluded side of the Smitherman property. According to Lawrence, Rodgers exited the truck and shot Mr. Smitherman through a window. Rodgers returned to the truck and Lawrence drove away.
State v. Lawrence, No. 98-270-CFA at 2-3 (Fla. 1st Cir. Ct. order filed Aug. 15, 2000).
[4] Lawrence called fourteen witnesses, including three experts, who testified extensively regarding Lawrence's background. Witnesses testified that Lawrence was slow and withdrawn and that his father's conviction and subsequent imprisonment for the sexual battery of Lawrence's twelve-year old half-sister furthered Lawrence's withdrawal. Testimony further revealed that Lawrence attempted suicide while in prison for a property offense and was thereafter committed to the state mental hospital in Chattahoochee until his sentence was served. The experts testified that Lawrence had organic brain damage and schizophrenia. Two of the three experts also testified that both statutory mental mitigators applied and that Lawrence could be considered a follower.
[5] See Spencer v. State, 615 So.2d 688 (Fla. 1993). At the Spencer hearing, the State introduced the scrapbook and books found in Lawrence's trailer and truck. The scrapbook included Lawrence's karate certificate, his high school diploma, references to serial killers, and a certificate of "Citizenship" in the Ku Klux Klan. The books included The Human Machine; The Anarchist Cookbook; Serial Killers; The Ultimate Sniper: An Advanced Training Manual For Military & Police Snipers; and Silencers, Snipers & Assassins: An Overview of Whispering Death. Lawrence testified and made an apology to the family of Robinson.
[6] In support of this aggravating circumstance, the trial court stated:

[T]he notes written by [Lawrence] reveal that he played an integral role in the calm, careful planning or prearranged designing of Jennifer Robinson's murder. The notes expose a detailed, preconceived plan to murder and mutilate a woman and the items they would use to carry out the plan....
....
Lawrence and Rodgers essentially followed their plan. First, they got Jennifer Robinson drunk. She was intoxicated when they had sex with her prior to the shooting.... Second, they both had sexual intercourse with her prior to her death. Third, Lawrence removed her calf muscle. He even held the dissected leg up for the codefendant to take pictures. A subsequent search revealed that a muscle was in a plastic bag in his freezer. The medical examiner testified that the shape and the area of the cuts on that muscle were consistent with having been removed from the victim's lower leg. Fourth, Jennifer Robinson's body was found buried in a shallow grave.
....
The actions of [Lawrence], viewed in conjunction with the list of items needed to carry out the murder/mutilation and the description of the methodology to be used, demonstrate that he was an active participant in the murder plot and not a passive follower or observer. Furthermore, the remarkable similarity between several of [Lawrence's] actions and the details of his notes discredit his attempts to minimize his involvement in the murder. Based on the evidence presented the State established beyond every reasonable doubt that [Lawrence] along with the codefendant planned this senseless and gruesome murder over a considerable time and later executed the murder according to their plan. As stated earlier, they jointly planned this murder in detail, selected an unsuspecting victim and carried out their plan to get her drunk, have sex with her, kill her, dissect her body, take some of "the meat" home and bury her body. This was a senseless, merciless murder. It was concocted and carried out with absolutely no moral or legal justification.
Although Lawrence may not have been the actual shooter, this aggravator still applies because the evidence conclusively demonstrates that the crime was a joint operation that was planned and executed in a cold, calculated, and premeditated manner.
Sentencing order at 5-8.
[7] Mitigating circumstances (4) and (5) were listed as non-specified statutory mitigating circumstances under section 921.141(6)(h), Florida Statutes (1997). The trial court found that the greater weight of the evidence did not establish that Lawrence acted under extreme duress or under the substantial domination of another person. See Sentencing Order at 16.
[8] The nonstatutory mitigating circumstances were: (1) Lawrence's extreme remorse (little weight); (2) Lawrence's leading law enforcement to the scene of the crime and to the body (some weight); (3) the offer of Lawrence to testify against the codefendant in exchange for a life sentence (little weight); and (4) Lawrence's model behavior as an inmate (little weight).
[9] Lawrence claims that (1) the trial court erred by failing to order a competency hearing for Lawrence; (2) the trial court erred by refusing to admit into evidence facts in support of the substantial domination mitigator and then rejecting that mitigator; (3) the trial court erred by finding the cold, calculated, and premeditated aggravator; (4) the trial court erred by issuing a defective and unreliable sentencing order; (5) Florida's capital sentencing scheme is unconstitutional; (6) the trial court erred in allowing a lay witness to testify to an opinion reserved for experts (raised in supplemental briefing); and (7) Lawrence's death sentence is disproportionate.
[10] Lawrence asks this Court to recede from its cases which hold that a trial court's decision regarding whether to grant additional competency hearings is reviewed for abuse of discretion. We decline to do so. We continue to conclude that the trial judge's resolution of the ongoing mental status of the defendant involves a credibility determination and observations of the defendant in the courtroom. These are decisions that a trial judge must make.
[11] This Court has upheld the death penalty in numerous cases where the defendant did not actually commit the homicide. See, e.g., DuBoise v. State, 520 So.2d 260, 266 (Fla.1988).
[12] The instant case is distinguishable from the cases cited by Lawrence. Lawrence first cites Huckaby v. State, 343 So.2d 29, 34 (Fla. 1977), in which this Court vacated a death sentence due to substantial mental mitigation. Huckaby, however, involved the imposition of the death penalty for a conviction of rape of a child under the age of eleven and is therefore clearly distinguishable. Lawrence also cites to Hess v. State, 794 So.2d 1249, 1265 (Fla. 2001), where this Court found a death sentence to be disproportionate for a defendant who suffered from a mental illness. However, the aggravating circumstances in Hess were not as significant as the aggravating circumstances in the instant case. See id. at 1266 (finding aggravating circumstances of (1) the murder was committed during the course of a robbery; and (2) the defendant was previously convicted of a violent felony (sexual activity with a child and lewd and lascivious assault)). The other cases cited by Lawrence are similarly distinguishable. Cf. Almeida v. State, 748 So.2d 922 (Fla.1999) (holding death sentence disproportionate for twenty-year-old defendant who murdered a bar manager where extensive mitigation outweighed single prior violent felony aggravator and jury vote in favor of death was seven to five); Cooper v. State, 739 So.2d 82, 86 (Fla.1999) (holding death sentence disproportionate for eighteen-year-old defendant with no prior criminal activity when mitigating circumstances of brain damage, mental retardation, and mental illness outweighed three aggravating circumstances, including CCP, and the jury's vote in favor of death was eight to four); Fitzpatrick v. State, 527 So.2d 809, 812 (Fla.1988) (holding death sentence disproportionate where defendant had emotional age between nine and twelve years, and neither CCP nor HAC was found); Miller v. State, 373 So.2d 882, 886 (Fla.1979) (vacating death sentence because trial judge improperly considered defendant's mental illness as an aggravating factor).
[13] In Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Emphasis supplied.) The Supreme Court extended Apprendi to capital sentencing schemes in Ring, but because none of the aggravating circumstances involved prior convictions, the Court was not called upon to address the Apprendi exception for prior convictions. See Ring, 122 S.Ct. at 2437 n. 4.