PER CURIAM.
 

 Jeremiah Martel Rodgers appeals a circuit court judgment imposing the sentence of death upon resentencing. We have jurisdiction pursuant to article V, section
 
 *1129
 
 3(b)(1), of the Florida Constitution. For the reasons that follow, we affirm Rodgers’ death sentence.
 

 FACTS
 

 Rodgers pled guilty as a principal to the first-degree murder of Jennifer Robinson, conspiracy to commit murder, giving alcohol to a minor, and abusing a human corpse. The facts surrounding the murder are set forth in
 
 Rodgers v. State,
 
 934 So.2d 1207, 1209-10 (Fla.2006). At the conclusion of the penalty phase, the jury recommended death by a nine-to-three vote, and the trial court followed this recommendation. On appeal, we vacated the death sentence and remanded for a new penalty phase proceeding because we found that the circuit court erred in excluding certain evidence that was relevant to Rodgers’ mitigation theory that codefendant Lawrence “had significant leadership in the murder of Robinson and was the dominant force in the conspiracy.”
 
 Id.
 
 at 1217.
 

 Shortly after jury selection for the second penalty-phase proceeding began, defense counsel informed the court that Rodgers had decided not to present any witnesses. Counsel further announced that he and Rodgers decided that the best method of presenting mitigating evidence would be solely through Rodgers’ own testimony. Rodgers was placed under oath and questioned about this decision. Rodgers informed the judge that he wished not to “put up a defense at all,” but he would just testify and tell the truth. He informed the judge that he understood the process, including the potential mitigation, and said that even if there was something in his past about his childhood that would help him, he would “rather not” introduce that evidence. The court inquired further about this statement and explained that the purpose of mitigation was to determine if there was any reason whatsoever for a court to recommend a sentence other than death. Rodgers then testified as follows:
 

 Okay. Well, I’m going to tell you the selfish reason I have also. You know, I have two reasons, and I’m going to be honest that death is my only escape. I’m 30 years old. I’m healthy, and I — I can’t imagine living 50 more years in prison. That’s worse than death. So a death sentence is, you know — they are both miserable ways to me, but, you know, a death sentence is, you know, in some strange way it gives me peace. It gives me an expected end, because this is not easy. Doing time this way is not easy.
 

 The judge inquired about this answer, asserting that Rodgers’ response seemed different from that of counsel, who stated that it would be a better strategic choice to have the mitigation evidence come only from Rodgers. Rodgers explained that he asked his counsel to not call witnesses, to not ask about his childhood, and to stick to only the crime itself. At that point, defense counsel clarified that he and his client discussed the anticipated testimony and decided that counsel would ask Rodgers about how he grew up and other background information. Although defense counsel had been prepared to call prior defense expert witnesses and other witnesses, he was honoring his client’s desires. Rodgers stated on the record that this was his decision and that he made it without any coercion. The court asked whether there was any indication that Rodgers was not competent, specifically stating that he “certainly [did not] see anything today or last week” which could cause him to question Rodgers’ competency. Counsel replied on the record that he did not see anything. The court fully explained the ramifications of failing to put on mitigation to the jury. Rodgers again stated that he did not have any intention to put up any defense or to mitigate, and his only intent was to testify on his behalf and “be done with it.”
 

 
 *1130
 
 Shortly after jury selection began, Rodgers decided to waive his right to a jury trial. When Rodgers was questioned as to this decision, he explained that he felt he could “trust the Court’s judgment better than people who I think are more against me than for me — more against me than neutral, I should say.” When the court inquired whether Rodgers had sufficient time and understanding before waiving his right to a jury, Rodgers replied, “I can count on a death sentence with you I feel, but with this jury, I mean, it could go six/six or I don’t know how it’s going to go; but I say go without the jury.” The court thoroughly questioned Rodgers, and Rodgers affirmed that this was his own decision and that he understood its ramifications. He told the court, “If I could sign a paper right now, and get a death sentence, and go back to death row, I would do it. To expedite the process, I would do it, you know.” The court found that Rodgers understood the consequences and the seriousness of waiving his right to a jury recommendation and that the decision was freely, voluntarily, and intelligently made.
 

 The penalty phase proceeding began the next day. The State presented much of the same evidence that was presented in the initial trial, including evidence relating to two prior violent crimes that Rodgers had committed: the attempted murder of Leighton Smitherman and the murder of Justin Livingston. Rodgers was the only defense witness. He testified very briefly as to the childhood abuse he suffered and did not discuss any prior mental health mitigation. Rodgers testified that he had initially lied about Jennifer Robinson’s murder when he told the police that he did not kill her. He later admitted that he shot her, describing his confession as “unburdening” himself. Rodgers described the crime as senseless and mindless, asserting that he was just an out-of-control young person who was very angry and had extreme violence that was pent up from his childhood. At the time, he did not consider the consequences of her death and how it would affect family and friends. When asked whether he had any remorse and if he learned anything, Rodgers responded, “A very difficult lesson, you know. And— and to harm innocence is, that’s hell. That’s hell. On the conscience. That’s my version of hell. You live with it.”
 

 On cross-examination, the State inquired further as to the relationship between Rodgers and Lawrence. Rodgers asserted that he had known Lawrence for a couple of years; they first talked about killing somebody when they were both in prison, years before the crimes occurred. After Lawrence and Rodgers were both released, they started hanging out together and again talked about killing. Lawrence appealed to Rodgers’ angry side. They could read each others’ moods and were like soul mates. However, Rodgers was careful to keep his girlfriend and her children away from Lawrence.
 

 The prosecutor questioned Rodgers in more depth about the Smitherman shooting, Justin Livingston’s murder, and Jennifer Robinson’s murder. As to Robinson, Rodgers stated that she was chosen for convenience and because Rodgers had no ties to her. On the night Rodgers picked Robinson up for their date, he had “ill intentions” but asserted that he did not take Lawrence’s plan of killing Robinson seriously. Rodgers claimed that he initially agreed to ask Robinson out because he was trying to help Lawrence become “lucky” since Lawrence was generally “unlucky” with women. Rodgers gave her a lot of alcohol and asked her if she would have sex with Lawrence, but she said no. He considered leaving Robinson alone with Lawrence but was worried what Lawrence would do to her when she did not agree to have sex with him, and he knew that the night would not end well. After Lawrence
 
 *1131
 
 unjammed the gun, Rodgers shot Robinson in the back of the head. Rodgers eventually agreed that Robinson’s murder was premeditated but stated that he did not have “grand premeditated schemes” in his mind. This was part of the reason why the murder bothered him so much — there was no “reason behind it.” When asked more about his motivation for killing Robinson, Rodgers replied, “I guess that I was evil.”
 

 Rodgers asserted that he was malingering when he saw prior mental health experts because he learned that this was a way of getting out of “close management,” where a prisoner was placed if he had too many discipline reports. Rodgers asserted that the reason that he committed the crimes was because he was out of control with anger and had pent-up violence. He wanted to self-destruct on a subconscious level. Although Rodgers was very bothered by what he did, he had not sought any psychological help. He testified that he saw mental health experts only when he was trying to avoid the responsibility for his actions.
 

 The trial court provided one last opportunity to present additional mitigating factors in a
 
 Spencer
 

 [1]
 

 hearing, but Rodgers did not present any new evidence. The trial judge found that the sentence of death was the appropriate sentence. In reaching this determination, the court found two aggravating circumstances: Rodgers was previously convicted of another capital felony or a felony involving the use of violence; and the murder was committed in a cold, calculated, and premeditated manner (CCP). The court rejected all of the proposed statutory miti-gators
 
 [2]
 
 except one, Rodgers’ age at the time of the murder, and afforded it little weight. Finally, the trial court found six nonstatutory mitigators: (1) Rodgers’ mother sexually abused him, his father physically abused him, his parents abandoned him and were addicted to drugs and alcohol, and his family had a significant history of suicide (given considerable weight); (2) Rodgers was incarcerated at an early age and sexually abused while in prison (given some weight); (3) Rodgers had an extensive history of mental illness (given considerable and substantial weight); (4) Rodgers had a positive impact on other inmates (given little weight); (5) Rodgers had genuine remorse (given some weight); and (6) Rodgers helped in the investigation of his other crimes (given some weight).
 

 Rodgers, through counsel, appeals the sentence of death, raising only two issues: (1) whether error was committed when Rodgers was not given a competency hearing after he waived his right to a jury and waived the presentation of significant mitigation; and (2) whether the death sentence is disproportionate.
 

 ANALYSIS
 

 In his first claim, Rodgers asserts that fundamental error occurred when neither the trial court nor his eoun-
 
 *1132
 
 sel requested a competency hearing after Rodgers waived his right to a jury recommendation for the penalty phase and waived his right to present mitigation.
 
 [3]
 
 In support of this claim, defense counsel relies primarily on the fact that the trial court knew of Rodgers’ prior history of mental illness and that Rodgers affirmatively stated that he wished to waive the jury recommendation and additional mitigation in an effort to be sentenced to death. Counsel urges this Court to adopt a new rule which would require a competency evaluation before a defendant is permitted to advocate for his own death, pointing to Florida Rule of Criminal Procedure 3.851(i), a rule which counsel recognizes applies only where a defendant seeks to waive postconviction proceedings after his direct appeal is final.
 
 [4]
 

 Contrary to Rodgers’ invitation to apply a different rule, Florida Rule of Criminal Procedure 3.210(b) is the applicable rule regarding such matters. Under rule 3.210(b), the trial court must hold a hearing to determine a defendant’s mental condition only where the court “has reasonable ground to believe that the defendant is not mentally competent to proceed.” Fla. R.Crim. P. 3.210(b). As this Court succinctly stated in
 
 State v. Tait,
 
 387 So.2d 338, 340 (Fla.1980), the issue is “whether any information coming before the court before or during [remand] provided reasonable ground to believe that the defendant’s mental condition was such that he was incompetent.” This Court will uphold the trial court’s decision as to whether such a hearing is necessary absent an abuse of discretion.
 
 Lawrence v. State,
 
 846 So.2d 440, 447 (Fla.2003);
 
 see also Hunter v. State,
 
 660 So.2d 244, 248 (Fla.1995) (“Once a defendant is declared competent, ... only if bona fide doubt is raised as to a defendant’s mental capacity is the court required to conduct another competency proceeding.”).
 

 We reject counsel’s argument that the trial court abused its discretion in failing to order a competency hearing. Immediately after Rodgers made statements regarding a desire for the death penalty, the court inquired of defense counsel whether there was any indication that Rodgers was not competent. The judge specifically stated that he “certainly [did not] see anything today or last week” which would cause him to question Rodgers’ competency. The court also relied on counsel’s statement that counsel was not aware of a problem with competency. Further, Rodgers’ statements to the court showed that he understood the consequences of his decisions and that Rodgers weighed his options of a life sentence or a death sentence in a rational and careful manner. The defendant clearly showed the capacity to appreciate the proceedings and the na
 
 *1133
 
 ture of possible penalties; he showed that he understood the adversary nature of the legal process; he manifested appropriate courtroom behavior; and he was able to testify in a relevant manner.
 

 In his second and final issue, Rodgers’, counsel asserts that the death penalty is disproportionate. The Court’s function in a proportionality review is not to reweigh the mitigation against the aggravation, but rather to “consider the totality of the circumstances in a case and compare it with other capital cases.”
 
 Bates v. State,
 
 750 So.2d 6, 12 (Fla.1999). By considering the totality of the circumstances in an individual case and comparing it to other capital cases, the Court ensures that the death penalty is “reserved for only the most aggravated and least mitigated of first-degree murders.”
 
 Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998).
 

 In this case, the trial court undertook a detailed review of all the circumstances presented, both in the second penalty phase and the prior penalty phase. The judge found two aggravating circumstances, conviction of a prior violent felony and CCP, and weighed them against the one statutory mitigator (Rodgers’ age) and numerous nonstatutory mitigating factors, including Rodgers’ extensive history of mental illness, the sexual abuse that Rodgers suffered from his mother, the physical abuse that Rodgers suffered from his father, his parents’ drug and alcohol addictions, parental abandonment, a family history of suicide, Rodgers’ early incarceration and sexual abuse while in prison, and Rodgers’ genuine remorse for the crime. After carefully evaluating and weighing these factors, the court concluded, “Although the Court finds that substantial mitigation exists in this case, the two serious aggravating circumstances, which have been proven beyond and to the exclusion of all reasonable doubt, greatly outweigh the mitigating circumstances.” In its sentencing order, the court compared this case to the codefendant’s case in
 
 Lawrence v. State,
 
 846 So.2d 440 (Fla.2003).
 

 Rodgers does not contest the factual findings made by the circuit court but alleges that the court erred in concluding that the aggravating factors outweighed the mitigation. He further supports this claim by relying on numerous statements in this Court’s prior opinion where this Court acknowledged that during the initial penalty phase, Rodgers had presented “extensive mitigation,” including “significant mental health history.”
 
 Rodgers,
 
 934 So.2d at 1219-20.
 

 Rodgers places too much emphasis on the initial penalty-phase proceeding, particularly in light of the fact that much of the proposed mitigation was disproved in the second penalty-phase proceeding. This Court remanded for a new penalty-phase proceeding because the trial court excluded evidence that related to two potential mitigating circumstances: (1) whether Rodgers was less culpable than Lawrence; and (2) whether Rodgers was under the substantial domination of Lawrence.
 
 Rodgers,
 
 934 So.2d at 1219-20. During the second penalty-phase proceeding, Rodgers testified in depth as to his relationship with Lawrence and never asserted that he was acting under Lawrence’s domination or claimed that he was less culpable than Lawrence. Rather, Rodgers described Lawrence as a soul mate and asserted that they were both fascinated with destruction and killing others. Rodgers further testified that much of the mental mitigation presented in his first penalty-phase proceeding was made up in an effort to avoid close management. Rodgers also reaffirmed his confession wherein he stated that he killed the victim.
 

 Rodgers also asserts that his sentence of death is disproportionate in light of numer
 
 *1134
 
 ous cases like
 
 Robertson v. State,
 
 699 So.2d 1343 (Fla.1997). In
 
 Robertson,
 
 the Court held that the death sentence was disproportionate where Robertson committed an unplanned murder by strangling a young woman he believed had befriended him. Although two weighty aggravators applied (that the murder was committed during the course of a burglary and HAC), the Court noted that substantial mitigation was presented in the case, including the fact that Robertson had a long history of mental illness, was under the influence of alcohol and drugs at the time, was only nineteen at the time, and had an abused and deprived childhood.
 
 Id.
 
 at 1347. Likewise, counsel cites to another similar case where a defendant spontaneously killed a victim.
 
 See, e.g., Offord v. State,
 
 959 So.2d 187 (Fla.2007) (finding death disproportionate in a case where the defendant, who was schizophrenic and bipolar, ran out of his medication and followed the voices in his head that told him to kill his wife).
 

 We do not find
 
 Robertson
 
 or the other cases relied upon by defense counsel to be similar to this case. Here, Rodgers had either killed or attempted to kill two other people in separate criminal acts before he and his codefendant coldly decided to murder Jennifer Robinson solely for the depravity of the act. Although Rodgers testified that Lawrence planned the murder, Rodgers admitted to following key aspects of the prearranged plan, including inviting the victim on a date, getting her drunk, killing her, and then taking pictures of the body.
 

 We find that the case most similar to the facts here is
 
 Lawrence v. State,
 
 846 So.2d 440 (Fla.2003), involving Rodgers’ eodefen-dant. In
 
 Lawrence,
 
 which was based on the same underlying facts, this Court held that Lawrence’s death sentence was proportional despite “substantial mitigating circumstances.”
 
 Lawrence,
 
 846 So.2d at 453. In reaching this decision, the Court relied on the trial court’s order, which found the same two aggravators that are present here:
 

 The prior violent felony aggravator was given great weight due to the fact that both prior offenses were committed pri- or to the murder of Jennifer Robinson, were committed with the co-defendant, Rodgers, and involved murder and attempted murder. Both of these prior crimes were senselessly violent and without any moral or legal justification. They are indicative of the same total disregard for human life evidenced in this case. In each case, Lawrence and Rodgers killed or attempted to kill another human being for the sheer excitement or depraved enjoyment of the act. In addition, the cold, calculated, and premeditated aggravator was given great weight due to [Lawrence’s] significant involvement in the planning, preparation, and execution of the murder.
 

 Lawrence,
 
 846 So.2d at 453 (quoting trial court’s sentencing order at 19-20). The Court also relied on similar cases with substantial mitigating circumstances.
 
 See, e.g., Robinson v. State,
 
 761 So.2d 269, 272-73 (Fla.1999) (upholding the sentence of death on a defendant who murdered an acquaintance in order to obtain money for drugs based on the trial court’s finding of three aggravating factors, two statutory mitigating factors, and eighteen nonstatu-tory mitigators including brain damage);
 
 Smithers v. State,
 
 826 So.2d 916, 931 (Fla.2002) (upholding two death sentences for two separate murders although defendant had significant mitigation, including two statutory mitigating factors and seven non-statutory mitigators including childhood abuse).
 

 Although Rodgers asserts that his case has significantly more mitigation than in
 
 Lawrence,
 
 the record does not support this
 
 *1135
 
 statement. Rodgers never alleged that he was under Lawrence’s domination or that his participation was minor. In fact, Rodgers acknowledged that he was the person who shot Jennifer Robinson, that he had “ill intentions” when he first picked her up from her home, and that he carried out key aspects of the plan. He testified that he and Lawrence were soul mates who could “read” each other, and he recognized that when he was with Lawrence, it encouraged his angry side to surface, so Rodgers was careful to ensure that his girlfriend did not spend much time around Lawrence. Moreover, in
 
 Lawrence,
 
 the trial court found more statutory mitigation, including that the murder was committed while Lawrence was under the influence of extreme mental or emotional disturbance and that Lawrence’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
 
 Lawrence,
 
 846 So.2d at 445. Rodgers has not shown how his case involves significantly more mitigation than was involved in
 
 Lawrence,
 
 in which substantial mental health problems and remorse were present. We hold that the sentence of death is proportionate in this case.
 

 CONCLUSION
 

 For the reasons stated above, we find Rodgers’ claims to be without merit. Accordingly, we affirm Rodgers’ death sentence.
 

 It is so ordered.
 

 QUINCE, C.J., and WELLS, PARIENTE, LEWIS, CANADY, and POLSTON, JJ., concur.
 

 LABARGA, J., did not participate.
 

 [1]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [2]
 

 . The court rejected the proposed statutory mitigators that Rodgers committed the murder while under the influence of extreme mental or emotional disturbance, that his capacity to appreciate the criminality of his conduct was substantially impaired, that Rodgers was an accomplice and his participation was minor, and that Rodgers acted under extreme duress or under substantial domination of another person. The court also rejected two of the proposed nonstatuto-ry mitigators: Rodgers pled guilty in this case and in federal court (not found as a mitigating circumstance since Rodgers did not state why he pled, other than perhaps to "unburden” himself, which would be self-serving): and Rodgers has the ability to adapt to incarceration (not found since Rodgers testified that he has received three disciplinary reports in the past five years).
 

 [3]
 

 . As to the allegation that trial counsel was ineffective in failing to request a competency hearing, we find such assertion premature. As this Court has recently reiterated, a claim of ineffective assistance may be considered during the direct appellate proceedings only if the "ineffectiveness is apparent on the face of the record and it would be a waste of judicial resources to require the trial court to address the issue.”
 
 Blanco v. Wainwright,
 
 507 So.2d 1377, 1384 (Fla.1987)). In this case, Rodgers’ ineffective assistance of counsel claim requires information that is not apparent on the face of the record, for example, the attorney's personal observations and conversations with Rodgers. In fact, even appellate counsel acknowledges that the record does not indicate how much personal contact trial counsel had with Rodgers. Thus, we deny this portion of the claim without prejudice.
 

 [4]
 

 . Although rule 3.851 provides for a hearing when a prisoner seeks to waive capital collateral proceedings, it does not mandate that a judge must automatically appoint mental health experts — a judge appoints two experts only where the judge concludes that there are reasonable grounds to conclude that the prisoner is not mentally competent.