934 So.2d 1207 (2006)
Jeremiah Martel RODGERS, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-185.
Supreme Court of Florida.
June 29, 2006.
*1209 Mark E. Olive, Tallahassee, Florida, for Appellant.
Charles J. Crist, Jr., Attorney General, and Curtis M. French, Assistant Attorney General, Tallahassee, Florida, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm the conviction and reverse the sentence of death.

FACTS
Jeremiah Martel Rodgers was the coperpetrator of the May 7, 1998, murder of Jennifer Robinson. The other coperpetrator and the codefendant in Rodgers' trial for the Robinson murder was Jonathan Huey Lawrence. Rodgers and Lawrence had become acquainted when both were being held at a state mental hospital in Chattahoochee. They had been released from confinement around the same time. We affirmed Lawrence's sentence of death in Lawrence v. State, 846 So.2d 440 (Fla. 2003).
On May 7, 1998, eighteen-year-old Jennifer Robinson went on a date with Rodgers after he had picked her up at her home and met her mother. Robinson never returned home that night. The following day, Rodgers showed Polaroid pictures of Robinson's desecrated body to his girlfriend, Patty Perritt, and his brother, Elijah Waldrup. Shortly thereafter, Rodgers left Santa Rosa County and drove to Lake County to see his father and sister. On May 9, Lake County law enforcement officers located Rodgers as he was driving his car, and Rodgers attempted to flee. When Rodgers was finally stopped, he exited the car with his handgun pointed to his head, leading to an hours-long standoff. A subsequent ballistics examination of the handgun revealed that it was the same weapon that was used to kill Robinson.
On May 10, 1998, Rodgers told Lake County law enforcement officers that he took Robinson on a date, accompanied by Lawrence. Rodgers stated that they took her to a wooded area, and Lawrence shot *1210 Robinson, mutilated her body, and took Polaroid pictures of what he had done. Rodgers claimed that he did not participate in the murder or mutilation and stated that he had considered shooting Lawrence because he was so angered by Lawrence's actions.
After being returned to Santa Rosa County, Rodgers gave a second statement to officers. In his May 13, 1998, statement, Rodgers acknowledged taking Robinson on a date as part of a plan. Rodgers met Robinson's mother and then drove to Lawrence's house to pick him up and use Lawrence's truck. Lawrence had already purchased Everclear grain alcohol, and they stopped at a gas station to pick up Mountain Dew and Dr. Pepper soft drinks to mix with the alcohol. They drove as far as they could into the woods and pretended to wait for Lawrence's girlfriend to arrive, although Lawrence and Rodgers knew that she was not coming. While pretending to wait, they mixed large portions of the alcohol with the soft drinks for Robinson, while drinking very little alcohol themselves. Rodgers and Robinson engaged in consensual sex. While this occurred, Lawrence walked into the woods to fix his handgun, which had jammed. When Lawrence returned, he handed the weapon to Rodgers. Rodgers convinced Robinson to go with him to look at a marijuana field, which did not exist, and as they were walking to Lawrence's truck, Rodgers shot her in the back of the head. The two men then placed Robinson's body in the back of the truck and drove to a place where they attempted to burn her clothes and then covered the body with debris.
On July 24, 2000, Rodgers entered a plea of guilty as a principal to the first-degree murder of Jennifer Robinson, conspiracy to commit murder, giving alcohol to a minor, and abusing a human corpse. In exchange for Rodgers' plea and acknowledgment that he was responsible for the murder as a principal, the State agreed that it would not argue that Rodgers was the actual shooter of Robinson and would not object to the defense's evidence and argument that specifically supported the theory that Rodgers was not the shooter. The trial court found that a sufficient factual basis existed to support the plea and, following an extended colloquy with Rodgers, found that the plea was freely, voluntarily, and intelligently entered into, and that Rodgers fully understood the consequences of his plea.
Extensive testimony and evidence were presented during the penalty phase. The State's first witness in aggravation was Joe McCurdy, a detective with the Santa Rosa County Sheriff's Office who investigated the Robinson murder and was involved in the investigations of the attempted murder of Leighton Smitherman and the murder of Justin Livingston. The State then called Leighton Smitherman, who testified about being shot in his living room while watching television on March 29, 1998. Smitherman never met either Rodgers or Lawrence. The State entered into evidence a certified copy of the conviction against Rodgers for the attempted murder of Smitherman. The State re-called Detective McCurdy and played Rodgers' May 13, 1998, tape-recorded confession to the Smitherman attempted murder.
Next, the State presented evidence concerning Rodgers' involvement in Justin Livingston's murder. The State played Rodgers' May 13, 1998, tape-recorded confession to the Livingston murder and then entered into evidence Rodgers' guilty plea *1211 and a certified copy of the conviction in the federal case of United States v. Rodgers, No. 3:98CR00073-002 (N.D. Fla. order filed June 29, 1999).[1] In his confession, Rodgers stated that he and Lawrence had decided to kill Livingston, so they took him out to Spencer Field to supposedly smoke a joint and then stabbed him multiple times. Rodgers received a life sentence for the murder of Livingston.
Finally, the State presented extensive evidence concerning the Robinson murder, including testimony from numerous police officers and experts concerning the evidence found in the Robinson murder investigation. The State also submitted Rodgers' conflicting confessions as to who killed Robinson. Elizabeth Robinson, Jennifer Robinson's mother, testified that she met Rodgers prior to his date with Jennifer on the night of the murder, and she read a statement about her daughter's life. The State entered into evidence various items found during a search of codefendant Lawrence's property, including a Polaroid picture of a person with a laceration to the top of the scalp, two lists that were handwritten by Lawrence and found in his residence, a box for a Lorcin pistol, and two empty Polaroid film canisters.
After the State rested, the defense began its mitigation testimony by focusing primarily upon testimony from family and friends to establish the conditions in which Rodgers lived as a child. The defense presented expert testimony concerning the significant mental health problems that Rodgers had exhibited throughout his entire life.
The defense also sought to introduce certain evidence found in Lawrence's truck, house, and property to support the conclusion that Lawrence dominated Rodgers in the Robinson murder and was responsible for the killing of Robinson. The defense re-called Detective Hand to testify about the search warrant executed to search Lawrence's residence. The court allowed into evidence items seized from the residence that related to the murder weapon. During a proffer of his testimony, Todd Hand testified about additional items seized from Lawrence's residence. He testified that a black hood and handcuffs were found, as well as Lawrence's daily work log, which was read into the record. Hand testified about other items found at Lawrence's residence, which included: a variety of ammunition; a pipe bomb; an owner's manual for a rifle; an automatic BB gun; a blackjack; two wooden stakes; two curved martial arts sickle knives; a screwdriver with a pointed end; two corkscrew devices; a temper sickle; a throwing star; another throwing star with four blades; handcuffs; nunchaks; a leather device with sixteen metallic studs; a pistol; gun cleaning kits; and a variety of receipts for guns and gun supplies. The majority of these items were denied admission into evidence.
The defense presented the jury with extensive testimony from Rodgers' family and friends concerning Rodgers' abused background. David Waldrup, the adoptive father of Rodgers' brother, Elijah Waldrup, testified regarding Rodgers' background, including allegations that Rodgers' parents had a severe drug addiction, were very abusive, and did not want their children. The Waldrups were able to adopt Elijah while he was still a baby. Shortly *1212 before the crime, Rodgers stayed with the Waldrups for a few months until he moved in with Patty Perritt, Rodgers' girlfriend. Waldrup recalled how Rodgers attempted to obtain the same medications that he was prescribed while he was at the mental health facility while in prison but could not find anyone who would help him. Elijah Waldrup, who was Rodgers' biological brother, testified regarding his recent relationship with Rodgers.[2] Elijah also testified about the day that Rodgers came to him very upset after the Robinson murder and told Elijah that Lawrence had shot Robinson and that he wanted to do the right thing.
Next, Patty Perritt, who was Rodgers' girlfriend at the time of the murder, was called as a defense witness. She testified that she was uncomfortable with Rodgers spending time with Lawrence and that Lawrence made her feel uneasy. Perritt also testified that Rodgers confessed to her that he was unfaithful to her with Robinson and told her that Lawrence had killed Robinson. Rodgers said that he wanted to commit suicide and asked Perritt to take the Polaroid pictures of Robinson and turn them over to law enforcement authorities. Diane Waldrup, Elijah Waldrup's adoptive mother, testified to the physical and verbal abuse in the Rodgers household and the circumstances surrounding her adoption of Elijah. Mary Pruitt, Rodgers' paternal grandmother, also testified to the horrible conditions in which her grandchildren lived until she took custody of the first two children, Tamica and Jeremiah Rodgers, for a few years. She also testified that as soon as she saw Tamica, she immediately fell in love with her and felt that Tamica was the baby girl that Pruitt had recently lost. However, when Rodgers was born, she was very concerned that she would not be able to handle two young children.
Rodgers' aunt, Renee Endress, testified that she and Janelle (Rodgers' mother) grew up with verbal and physical abuse and that their father drank alcohol excessively until his premature death. Janelle was physically beaten by Rodgers' father, Steven; Janelle also had a problem with alcohol abuse and became aggressive and a completely different person when she drank. Endress saw bruises on the children and thought Janelle was too physically rough with them. She was also very sexually promiscuous and eventually committed suicide. Endress further testified that all of her brothers and sisters had some sort of mental disorder or emotional problem that greatly affected their lives or caused early deaths or suicide attempts.
Zachariah Walker, Rodgers' half-brother, testified about his mother's drug addiction and the abuse he suffered from his mother. Rodgers' full sister, Tamica Williams, testified about the child abuse she suffered growing up and how she was more of a mother to Rodgers than Janelle was. She said that Rodgers was punished even worse than she had been, he was often left with bruises, and Janelle seemed to have difficulties in stopping when she began to beat Rodgers. She also felt bad because she knew she was given much more affection from their grandmother, and her grandmother would give her special presents and tell her that she was her favorite. According to Tamica, Rodgers told her that he did not shoot Robinson. She testified about Rodgers' multiple attempts to commit suicide and how he would mutilate his own body.
Finally, the defense presented testimony from numerous social workers and experts *1213 about Rodgers' mental problems. Angela Mason, a social worker, reviewed a variety of records from schools, institutions, hospitals, and law enforcement agencies. The records contained reports that Rodgers was given his first beer at two years of age and that he reported sexual abuse by his mother numerous times, starting at age three. At fourteen, Rodgers reported that his mother had full sexual intercourse with him on multiple occasions, first getting him high on marijuana that was laced with formaldehyde. Although Child Protection Services was called about the abuse, Mason was unable to find any investigative report. Another report stated that Rodgers' father threatened to shoot him and put an unloaded gun to Rodgers' head. At school, Rodgers was placed in a class for severely emotionally disturbed children. Rodgers attempted suicide five times by the age of thirteen, including slitting his wrists in a bathtub which left physical evidence.
David Foy, a professor of psychology at Pepperdine University, reviewed Rodgers' medical records and testified that six out of the six classic risk factors for mental illness existed in Rodgers' childhood home life. Rodgers was diagnosed with post-traumatic stress disorder. Dr. Sarah Deland, a psychiatrist, testified as an expert regarding Rodgers' mental health. Dr. Deland stated that Rodgers' diagnoses were post-traumatic stress disorder, disassociative disorder, substance abuse in remission, and borderline personality disorder. She testified in depth about these particular diagnoses and how Rodgers' life events shaped his development.
In rebuttal, the State called Dr. Richard Greer, who was the Chief of Forensic Psychiatry at the University of Florida. According to Dr. Greer, Rodgers' primary diagnosis was a personality disorder, and his secondary diagnosis was depression. Finally, the State called Vickie Truel, who was a coworker with Robinson at the Corner Quick Stop, where Robinson first met Rodgers. Truel testified that Rodgers told her that the reason for the scars and cuts on his arms was that "if you can make people think you're crazy, you can get by with anything."
At the conclusion of the penalty phase, the jury recommended death by a nine-to-three vote. In a detailed sentencing order, the judge found two aggravators, to which he gave great weight: prior violent felony and cold, calculated, and premeditated. The court rejected Rodgers' proffered statutory mental health mitigators[3] but found that Rodgers had committed the crime at a relatively young age (twenty-one years) and afforded it little weight. The court further found three nonspecified statutory mitigators[4] and three nonstatutory *1214 mitigators.[5] The court sentenced Rodgers to death, finding "the two serious aggravating circumstances which have been proven beyond and to the exclusion of all reasonable doubt, greatly outweigh the mitigating circumstances." State v. Rodgers, No. 98-274-CFA, order at 20 (Fla. 1st Cir. Ct. order filed Nov. 21, 2000).

MERITS
In his direct appeal, Rodgers raises eight claims, including challenges to his guilty plea and penalty-phase proceedings. In the challenge to the guilty plea, Rodgers claims the trial court erred when it denied his motion to withdraw his plea based upon his attorneys' conflict and unpreparedness. Further, he claims that he was involuntarily absent from a hearing in the judge's chambers while his attorneys' conflict was being discussed.
A disagreement between Rodgers' attorneys began before the trial when they discussed the guilty plea. Defense counsel disagreed as to whether Rodgers should enter the plea, and a recess was taken. During the recess, the attorneys met together with Rodgers and explained the plea to him. After the recess, although his attorneys still disagreed on the plea decision, Rodgers decided to enter the guilty plea, and a lengthy colloquy occurred.[6] During the plea colloquy, the court advised Rodgers that the decision to plead guilty was his.
THE COURT: All right. And you understand, sir, that that's a right personal to you. Your attorneys may advise you as to what they believe is in your best interest, but your right to testify in your own behalf is a personal right, and it's your decision and no one else's decision. Did you understand that?
THE DEFENDANT: Yes, sir.
THE COURT: Do you also understand, sir, that the right to a jury trial similarly is a right personal to you. In other words, only you can waive that right. And certainly your attorneys are educated in the law and experienced in these areas and you ought to give weight to their recommendations, but the bottom line is that this is your trial; and it has to be your decision. So is it your decision to plead guilty, sir?
THE DEFENDANT: Yes, sir.
THE COURT: And in reaching that decision have you considered the advice of your Counsel?

*1215 THE DEFENDANT: From both sides, yes, sir.
Rodgers acknowledged the existence of a disagreement between his defense attorneys in his statement that he considered the advice of counsel "from both sides."
After the guilty plea, the penalty-phase portion of the trial continued through jury selection, opening statements, and the testimony of the first few State witnesses. Defense counsel LeBoeuf then told the court that she wanted to have a hearing in chambers with just the attorneys. A conference occurred in chambers, where LeBoeuf stated that she had a conflict with co-counsel White that "affected preparation" of the case. The basis for this conflict was that the two attorneys, who were independent defense counsel, disagreed relative to which attorney should handle the cross-examination of the State's penalty phase witnesses, many of whom were initially scheduled to testify during the guilt phase. The two had planned for White to handle the guilt phase of the case and for LeBoeuf to handle the penalty phase.
LeBoeuf said that she wanted to waive Rodgers' presence at the hearing because he was "fairly unstable at the moment. He's very attached to Mr. White as his lawyer, also very attached to me as his lawyer, and not capable of understanding that reasonable disagreement occurs between reasonable people." White and the State objected to Rodgers' absence. The hearing reconvened in chambers after lunch, at which time Rodgers was present. The judge told Rodgers that there was a conflict between White and LeBoeuf and that LeBoeuf had requested a hearing in Rodgers' absence but White objected. The court asked Rodgers if he minded being absent from the hearing, and Rodgers stated, "I'm okay with that. I'll just wait in the back." Then the court asked one more time if he minded "absenting [him]self," to which he replied, "Yeah, I'll just take the time out and, you know, just sit by myself." Rodgers waited outside of chambers in the judge's waiting room while his attorneys discussed their conflict. Both attorneys informed the court that based on the changed circumstances of the plea, they felt unprepared to proceed with the cross-examination of the penalty phase witnesses. The judge resolved the conflict by adjourning for the day so that the defense attorneys could better prepare for the penalty phase and discuss with Rodgers any decisions that would be necessary. In making this decision, the court noted that the attorneys had already spent approximately two years preparing for trial but understood that in light of the change, the attorneys needed a little more time to discuss between themselves and their client how to best handle the cross-examination.
The next day, both White and LeBoeuf stated that they were ready to proceed, but LeBoeuf moved for a mistrial based on the record from the day before. The trial court denied the motion for mistrial, and the penalty phase continued without conflict for the remainder of the trial. However, at the Spencer[7] hearing, attorney Tim Schardl appeared on Rodgers' behalf to challenge the manner in which Rodgers had been advised of his plea, and Schardl filed a motion to stay the proceedings so that he could more fully explore the issues. The court recited some of the prior events, including the extensive plea colloquy and the discussions in chambers, and denied *1216 the motion to stay. The motion contained no specific information as to why Rodgers wanted to withdraw his plea except for the stated conflict between his attorneys. Nevertheless, after the Spencer hearing, the court sua sponte entered an order scheduling a hearing to address the issues raised by Schardl.
At the hearing, Rodgers was asked several questions by the court and stated that he learned "that the problem between these two [attorneys] was a little more than I knewa lot more than I knew." Rodgers stated that his attorneys did not tell him of their problems before the date of the Spencer hearing, and he learned that they were "at odds all the way through" his representation. Rodgers explained that he did not know "[a]nything about the plea. I didn't know the good to taking it, the bad to taking the plea. I didn't know anything about it." However, Rodgers was "happy with both" attorneys and did not waive the attorney-client privilege to allow for evidentiary development.
After hearing argument by Schardl and testimony from defense attorneys LeBoeuf and White, the court denied the motion to withdraw the plea. In the order denying Schardl's motion to allow Rodgers to withdraw his plea, the court stated:
After full reflection, consideration and review of the transcript of the prior proceedings in this matter, there is no evidence before this court which leads it to believe that the Defendant's plea of guilty was not freely, voluntarily, and intelligently entered after the Defendant had the benefit and advice of counsel. The Defendant was present when counsel made known their difference of opinion as to whether or not he should enter a plea to the charges. The degree to which counsel disagreed is not material. The fact that Defendant was aware of the disagreement between counsel as to whether or not he should enter his plea is significant. It is clear from the record that the disagreement between counsel was made known to the Defendant, that the Defendant weighed and considered the advice of both counsel and that the plea which he entered was his plea after he had an opportunity to weigh and consider both lawyers' advice to him.
Rodgers has not shown error. The withdrawal of a guilty plea is within the sound discretion of the trial court. Hunt v. State, 613 So.2d 893, 896 (Fla.1992). The trial court's decision regarding withdrawal of a plea will generally not be disturbed on appeal absent a showing of an abuse of discretion. See id. Rodgers understood at the time of his plea that his attorneys disagreed on whether he should enter the plea. We find no error in the trial court's denial of the withdrawal of Rodgers' plea.
We also find that Rodgers waived the right to be present at the hearing in the judge's chambers. Although criminal defendants have a due process right to be physically present at all critical stages of a trial, see Muhammad v. State, 782 So.2d 343, 351 (Fla.2001), this right may be waived by the defendant. Rodgers was advised that the in-chambers hearing would address his counsel's internal disagreement and that his counsel believed it was in Rodgers' best interest for him not to be at the hearing. Rodgers then agreed to wait in the waiting room of the judge's chambers so that he would not hear the discussion. We find no error in Rodgers' absence from the hearing in chambers.
Rodgers also claims that, in violation of his rights, prison guards forced him *1217 to take medication while in pretrial detention.[8] The issue of forced medication was not raised in the court below and thus not preserved for appeal. There was no objection in the record about the defendant being forced by prison guards to take medication. See Spann v. State, 857 So.2d 845, 852 (Fla.2003) (error must be preserved for appeal by proper objection); Conahan v. State, 844 So.2d 629, 641 (Fla.2003).
In his first penalty-phase issue, Rodgers argues that the trial court erred in its decision to exclude certain items of evidence that were retrieved from Lawrence's residence. Rodgers contended that these items were relevant to Rodgers' mitigation theory that Lawrence had significant leadership in the murder of Robinson and was the dominant force in the conspiracy to which Rodgers had pled guilty.[9]
Specifically, Rodgers' counsel offered into evidence all of the items seized from Lawrence's residence, which included:
A small red notebook in the handwriting of Mr. Lawrence, a throwing knife in a sheath, a knife with a black-taped handle, a black hood, a pair of handcuffs, a.410 Winchester live shotgun shell, a red plastic container with suspect gun powder.. . . [M]iscellaneous live and spent ammunition, a suspected pipe bomb that I'm told is rendered harmless now, a firearm cleaning record, a folding buck knife, two throwing stars, two wooden stakes, one pair of S & W handcuffs, one pair of nunchaks, one Sears screwdriver with a sharp point, one black leather slapjack, one knife with a black handle, one sickle, one T-handle cork screw, two unknown type weapons with blades, one wood-handled chisel, one fingerless black glove, two black knives with sheaths, one Velcro wrist strap, one chrome spike wristband, one silver-sharpened piece of metal, one "Assault Weapons" book, one "Silencer Snipers and Assassins" book, one "Ultimate Sniper" book, one "Trapper and Mountainmen" book, one "Dear Mom, a Sniper's Vietnam" book, one "Wild Foods Field Guide" cookbook, one "Sniper World of Combat" sniping book, one "U.S.M.C. Close Quarters Combat Manual," one "U.S. Special Forces Conditioning Program" book, one "Marine Sniper" book, one "Undercover Official Cookbook," one marksman BB Pistol, one Wal-Mart receipt for a .270 caliber Remmington rifle, one Remmington gun literature, 20 rounds of .270 caliber Hornaday live ammo boxammo in a box, 19 rounds of.12 gauge live ammunition, one U.M.C..380 caliber ammunition in a box with four live rounds, one gun cleaning kit, one receipt for the Lorcin .380 serial number 480849, one box with Derringer *1218 percussion serial number 176962 "jukar". . ., one nipple-cap, one ramrod with powder measurer.
Jury Trial Proceedings, vol. 9, at 1580-81. The State objected to their admission on relevance grounds.
Rodgers' counsel argued to the trial judge the following:
Your Honor, in order to argue culpability we need to be able to argue about a person's knowledge of weapons, the use of weapons, and things of that nature.
The testimony will be that Mr. Rodgers was in prison until approximately Thanksgiving of '98-'97. And then this offence occurred on May 7, 1998. For the rest of that period of his adult life he was incarcerated in prison.
On the other hand, Mr. Lawrence has a number of things that point to him having tremendous knowledge about weapons, the use of weapons, about woods, or the forest area, and the ability to survive in that area. These weapons and the literature that is here that we have listed for the Court is the same stuff, the same material, the same guns, ammunition, and literature that were introduced in the Lawrence case. Apparently they had some relevance in that case to show the same thing.
We are seeking to introduce this to show that Mr. Lawrence had knowledge of weapons, knowledge of the use of weapons, knowledge of ammunition, knowledge of the use of ammunition, and to show that his knowledge of these things allowed him to be the dominant force in the conspiracy to which Mr. Rodgers has pled.
These things have tremendous relevance in this case. We believealthough I can't certify it because I was not therewe believe the State used these same items in the Lawrence case to prove the same thing.
The trial court admitted the receipt for the purchase of the Lorcin handgun and the ammunition, stating:
I'm going to allow that in. I'm going to allow the evidence regarding the boxes [of] .380 ammunition, since that's the same caliber of this Lorcin semi-automatic; but all the other items that were seized at Mr. Lawrence's home, the Court is not going to allow those. But I will allow the Defense to introduce the sales receipt of the Lorcin semi-automatic and also the box of the .380 ammunition.
The Court subsequently allowed into evidence the cleaning kit because the cleaning kit could be used to clean a pistol, which was the murder weapon.
In this appeal, Rodgers argues that the decision by the trial judge to deny the admission of the items found at Lawrence's residence was contrary to Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion), in which the Supreme Court stated:
[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.
Id. at 604, 98 S.Ct. 2954.
Rodgers further points out that we approved the admission of this same material from Lawrence's residence for consideration *1219 by the sentencing judge at the time of Lawrence's capital sentencing trial. Lawrence v. State, 846 So.2d 440, 448-49 (Fla.2003). Specifically, during the sentencing phase of Lawrence's trial, Lawrence contended that Rodgers had been the dominant force in the murder. At a hearing pursuant to Spencer v. State, 615 So.2d 688 (Fla.1993), in the Lawrence case, the State introduced many of the very same items that were excluded in Rodgers' trial, including the following books: (1) William Powell, "The Anarchist Cookbook," (1971); (2) TimeLife Books, "Serial Killers" (1992); and (3) five books about snipers including John L. Plaster, "The Ultimate Sniper: An Advanced Training Manual For Military & Police Snipers" (1993), and J. David Truby, "Silencers, Snipers & Assassins: An Overview of Whispering Death" (1972). See Lawrence, 846 So.2d at 448-49. The State also introduced a scrapbook that Lawrence had compiled that included numerous articles about serial killers, many of which predated Lawrence's involvement with Rodgers, and it introduced the book, The Incredible Machine, which provided detailed information about the human body. When reviewing the codefendants' relevant participation, the trial judge in Lawrence's case found the above information relevant, noting: "The books and the scrapbook reveal Lawrence's interests and support the State's contention that he would have actively participated in the murder." Lawrence, 846 So.2d at 449 (quoting the sentencing order). The judge also found that because several sections of The Incredible Machine were marked with a pen, including a picture of the calf muscle on a female body, possession of this book indicated that Lawrence initiated and carried out the plan to cut the calf muscle that was found in Lawrence's freezer. Id. at 449. Although the evidence was admitted in Lawrence's trial to rebut Lawrence's contention that Rodgers was the dominant force in the murders, the trial court permitted it because the evidence was relevant as to which defendant was active in what parts of the planning and implementation of the murder plan. As addressed above, we did not disapprove of the trial judge's rulings on this matter in Lawrence's case.
Under section 921.141(6)(e), Florida Statutes (1997), the fact that the defendant acted under "the substantial domination of another person" is a statutory mitigating circumstance. We conclude that Rodgers was entitled to have the jury consider the proffered Lawrence evidence in support of Rodgers' theory that at the time of the murder, he was under the domination of Lawrence. Moreover, Rodgers was entitled to have considered by the jury the evidence as to whether, under the circumstances of the Robinson murder, Rodgers was so less culpable than Lawrence for the murder of Robinson that Rodgers should not be sentenced to death. The relative culpability of Rodgers and Lawrence was relevant in this penalty phase. See Hertz v. State, 803 So.2d 629, 653 (Fla.2001). This was clearly relevant here since the State stipulated as part of Rodgers' plea bargain that the State would not argue that Rodgers was the actual shooter of Robinson.[10] Given the extensive mitigation which was *1220 presented in the case, including Rodgers' significant mental health history, we cannot say that the State has shown that there is no reasonable possibility that that the error in excluding this evidence did not contribute to the sentence of death. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). Therefore, we find that the denial of the admission of the specified evidence from the Lawrence residence was harmful error and requires a new penalty phase.
In view of our conclusion in respect to this first argument, all other penalty-phase issues are moot. However, we do write further to point out that there is an error in the statutory aggravator in respect to the attempted murder conviction for the crime in which Leighton Smitherman was the victim. From the document filed with this Court, we see that in the Smitherman case, the caption of the information filed on January 24, 1998, stated:
1) attempted first-degree felony murder
2) shooting at, into or within a building
However, the body of the information charged attempted first-degree premeditated murder:
Jeremiah Martel Rodgers, on or about March 29, 1998, at and in Santa Rosa County, Florida, did unlawfully from a premeditated design to effect the death of a human being; to-wit: Leighton Smitherman, did attempt to kill and murder said Leighton Smitherman by shooting him with a .380 pistol and did in the process, use, carry, or possess a weapon, to-wit: a .380 caliber pistol, in violation of Sections 782.04 and 777.04, Florida Statutes.
Count two alleged the crime of shooting into a building, a violation of section 790.19, Florida Statutes (1997).
A jury found Rodgers guilty as charged, and he was sentenced in February 2000 to thirteen years and five months in prison. The sentencing document listed the attempted murder crime as follows: "MURDER ATTEMPT 1ST DEGREE 782.04, 777.04." That conviction was used as one of the bases for the prior violent felony conviction aggravator in the penalty phase of this case.
The First District Court of Appeal subsequently overturned the attempted first-degree murder conviction for reasons not presently material. See Rodgers v. State, 869 So.2d 604 (Fla. 1st DCA 2004). Rodgers thereafter agreed to plead no contest to the crime of "attempted murder with a firearm" and receive the same sentence imposed previously. The plea hearing was conducted on June 7, 2004. Rodgers affirmed to the court that he was pleading guilty[11] and that the facts and charges as alleged in the information were true and correct:
COURT: And, sir, do you understand that by an admission of guilt that what you're saying is that the facts, as they *1221 are alleged in the Information, are true and correct? And you are guilty and you actually committed those two offenses in the way that they were described in the Information?
RODGERS: That's what I am pleading to.
Sentencing Hearing at 13-14, State v. Rodgers, No. 98-332 (Fla.2d Cir. Ct. June 7, 2004). The alleged facts were stated by the assistant state attorney and based in part on Rodgers' confession that Rodgers and Lawrence decided to shoot someone and that Rodgers fired at Smitherman, a stranger, who was sitting in a chair watching television with his family. The court again expressly asked Rodgers if he admitted the facts, and Rodgers responded, "Yes, sir." Id. at 15. The court accepted the plea and adjudicated Rodgers guilty as follows:
Mr. Rodgers, based upon your plea of guilty to Count 1, Case Number 98-322, the attempted murder with a firearm of Mr. Smitherman, Count 2, the shooting into a dwelling, the Court is going to find that the plea of guilty on both counts is freely, voluntarily, and intelligently entered after you've had the benefit and advice of counsel.
The Court is going to adjudicate you guilty on both Counts 1 and 2.
Id. at 19.
The court sentenced Rodgers to concurrent sentences of 161 months in prison and imposed a mandatory minimum of three years for the use of a firearm. The 2004 judgment stated that Rodgers pled guilty "to the following crimes" and listed the attempted murder crime as follows: "ATTEMPTED 1ST DEGREE FELONY MURD[ER] 782.04, 777.04."
Rodgers' attorney in this death appeal, Mark Olive,[12] appealed the attempted murder conviction to the First District Court of Appeal. The initial brief raised two issues. First, counsel argued that Rodgers was charged only with attempted premeditated murder but pled guilty to attempted felony murder. Appellate counsel claimed this was error because Rodgers stood convicted of a crime with which he was not charged. Citing Florida Rule of Criminal Procedure 3.610 (Motion for Arrest of Judgment), counsel claimed that the information did not actually charge attempted felony murder and did not cite section 782.051, Florida Statutes. The district court per curiam affirmed. Rodgers v. State, 903 So.2d 941, 2005 WL 1493357 (Fla. 1st DCA 2004).
However, while acknowledging the finality of Rodgers' conviction for the Smitherman crime, we conclude that it would not be accurate for the jury in the new penalty phase to consider the written final judgment which reflects that Rodgers pled guilty to attempted felony murder. Rather, it is clear beyond a reasonable doubt that Rodgers pled guilty to attempted first-degree premeditated murder with a firearm, in violation of sections 782.04 and 777.04, Florida Statutes (1997). This error is to be corrected by the sentencing court in the Smitherman case before the written judgment of conviction is admitted in the new penalty phase. See Boggs v. Wainwright, 223 So.2d 316, 317 (Fla.1969) (court of record may, even after term has expired, correct clerical mistakes in its own judgments and records, nunc pro tunc; such corrections generally relate back and take effect as of date of judgment, decree, order, writ, or other record so corrected).

CONCLUSION
We affirm Rodgers' conviction based upon Rodgers' plea of guilty. We reverse *1222 Rodgers' sentence of death and order a new penalty-phase proceeding before a jury.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, and LEWIS, JJ., concur.
CANTERO, J., concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.
BELL, J., recused.
CANTERO, J., concurring in part and dissenting in part.
Although I concur in affirming Rodgers's conviction, I dissent from the majority's reversal of his sentence and remand for a new penalty phase. The evidence the majority concludes is relevant to mitigation was confiscated not from Rodgers's home, but from codefendant Lawrence's. The majority nevertheless concludes that the evidence was relevant to Rodgers's claim that he was under Lawrence's domination and that he was "less culpable" in Jennifer Robinson's murder. Majority op. at 1219. Then, without further discussion, the majority finds the evidence's exclusion was "harmful error." In my view, the trial court did not abuse its discretion in excluding the evidence as irrelevant. But even if the trial court was wrong, the error was harmless beyond a reasonable doubt.

I. RELEVANCE IS ESSENTIAL
"To be admissible . . . evidence must be relevant, and the admission of evidence is within the trial court's wide discretion." Chandler v. State, 534 So.2d 701, 703 (Fla. 1988) (citations omitted); see also LaMarca v. State, 785 So.2d 1209, 1212 (Fla.2001) (stating the "admissibility of evidence generally turns on relevance"). The admissibility of evidence is within the sound discretion of the trial court, and the trial court's determination will not be disturbed on appellate review absent a clear abuse of that discretion. Brooks v. State, 918 So.2d 181, 188 (Fla.2005). That is, the court's ruling must be unreasonable or arbitrary. See Huff v. State, 569 So.2d 1247, 1249 (Fla.1990).
The evidence Rodgers sought to admit consisted of various weapons and books, none of which were used in the murder but which were found on codefendant Lawrence's property. See majority op. at 1217-18 (listing items). Rodgers argued that the evidence supported two statutory mitigating factors: minor participation in the murder and acting under the substantial domination of another. See § 921.141(6)(d)-(e), Fla. Stat. (1997). The trial court concluded, however, that the items were not relevant to these factors.
I acknowledge that courts must allow defendants facing a possible death penalty to introduce all evidence of possible mitigation. In Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion), the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." But the requirement of relevance applies just as much to mitigation evidence as to any other. After Lockett, the Supreme Court emphasized that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to *1223 consider, as a matter of law, any relevant mitigating evidence." Eddings v. Oklahoma, 455 U.S. 104, 113-14, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (second emphasis added). We have held that Lockett requires the "admission of evidence that establishes facts relevant to the defendant's character, his prior record, and the circumstances of the offense in issue." Hess v. State, 794 So.2d 1249, 1269 (Fla.2001) (emphasis added) (quoting Herring v. State, 446 So.2d 1049 (Fla.1984)). Thus, in the penalty phase, "a defendant has a right to present evidence that is relevant to the nature and circumstances of the crime," such as evidence "that the defendant played a relatively minor role in the murder compared to the other participants." Way v. State, 760 So.2d 903, 917 (Fla.2000) (emphasis added); see, e.g., Gore v. Dugger, 532 So.2d 1048, 1050 (Fla.1988) (finding that evidence of a cousin's longtime influence on the defendant was irrelevant on the issue of substantial domination under facts of the case, but under Lockett concluded that "it was [not] totally unrelated to [Gore's] character"). "[T]he defendant can also introduce evidence that is relevant to any of the statutory aggravating circumstances the State seeks to establish or to any statutory or nonstatutory mitigation." Way, 760 So.2d at 917 (emphasis added). These cases teach that, while the defendant must be allowed to introduce all mitigating evidence, the penalty phase is not a free-for-all. The judge retains a gatekeeping role, ensuring that evidence offered to support mitigation is actually relevant to that issue.
In this case, Rodgers offered the evidence found in Lawrence's home to support the mitigating factors of substantial domination by another and that Rodgers played a comparatively minor role and was therefore less culpable in the murder. Rodgers failed to connect the books and weapons found in Lawrence's home to his claim that Lawrence coerced, threatened, or intimidated him or that Rodgers was less culpable.
The majority notes our approval of the admission of "this same material from Lawrence's residence" during Lawrence's Spencer hearing, majority op. at 1218, suggesting that if it was admissible there, it should be admissible here. This comparison is flawed. First, the evidence from Lawrence's case was not the same. In our opinion in Lawrence, we discuss books, not weapons, that were admitted. 846 So.2d at 448. Lawrence's books on serial killers and snipers were admitted to rebut his claim that Rodgers dominated him in the Robinson murder. We concluded the evidence was relevant because it "reveal[ed] Lawrence's interests and support[ed] the State's contention that he would have actively participated in the murder." Id. at 449 (quoting trial court's order). In other words, the evidence was relevant to show that Lawrence voluntarily participated in the murder and was not acting under duress, threat, or coercion. Id. Evidence suggesting that Lawrence acted voluntarily, however, and that Rodgers did not dominate him, does not support the converse inference that Lawrence instead dominated Rodgers. Further, there is no evidence that Rodgers even knew about the books or the weapons, that Lawrence discussed them with Rodgers, or that they influenced Rodgers's behavior in the murder.
The majority also concludes that the evidence was relevant to show that Rodgers was less culpable than Lawrence in Robinson's murder. Majority op. at 1219. Again, however, I see no link between Lawrence's possession of books on snipers *1224 and serial killers, and his possession of various weapons, and Lawrence's and Rodgers's comparative roles in the murder. That Lawrence had "a sick fascination with killing," as Rodgers states in his brief, does not make Rodgers himself less culpable. The trial court did not abuse its discretion.

II. HARMLESS ERROR
Even if the materials taken from Lawrence's home were somehow relevant to the circumstances of the offense, any error in denying their admission was harmless beyond a reasonable doubt. See Doorbal v. State, 837 So.2d 940, 959-60 (Fla.2003) (applying harmless error analysis to alleged Lockett error).
First, the jury reviewed evidence, some of it offered by the State and some by Rodgers, that, as Rodgers's counsel argued, related to Rodgers's claims of substantial domination and minor role or lesser culpability. The jury heard evidence that Rodgers knew Lawrence from when they were together in the state mental hospital for prisoners. Then, when Rodgers settled in the town of Pace, he began spending an increasing amount of time with Lawrence, despite the disapproval of his brother and girlfriend. The trial court admitted Lawrence's pistol (which was both the murder weapon here and the weapon used to shoot Smitherman), evidence that Lawrence bought the gun illegally through a third party, and related items seized from Lawrence: ammunition of the same type used in the murder weapon; sales receipts for the gun and ammunition; and a pistol cleaning kit. The court also admitted other evidence directly related to Lawrence's role in the murder: two notes handwritten by Lawrence containing a plan of action (e.g., "get Jeremiah to make phone calls," "get her very drunk," "dissect completely," and "bag up edible meats") and listing items needed to effectuate the plan (e.g., Everclear, film for a Polaroid camera, scalpels, and a shovel); the flesh Lawrence excised from the victim's leg, which Lawrence kept in his freezer; pictures of the victim; a Polaroid camera; empty Polaroid film canisters; and an ice chest that once contained human remains. The defense also entered a May 10 statement by Rodgers that Lawrence shot Robinson while Rodgers was in the woods urinating, and that Rodgers did not know Lawrence planned to murder her.
In closing, defense counsel argued as follows:
And the State says that Jeremiah and Jonathan had this elaborate scheme and they had written a plan. . . . Jonathan Lawrence made those notes[,] . . . made those plans[,] . . . [and] had an idea in his head. . . . And yet there is not one shred of evidence that Jeremiah Rodgers participated in the procurement of the items [on the lists].
Defense counsel also listed the evidentiary items related to the Robinson murder found at Lawrence's place, emphasizing they all belonged to Lawrence. Thus, although Rodgers pled guilty to being a principal in the murder, defense counsel argued that Lawrence initiated, planned, and obtained the items for the murder and then shot Robinson. In light of the evidence admitted on their comparative roles, the excluded items would add nothing.
In rejecting the statutory mitigators of minor participation and substantial domination by another, the trial court found that even if Lawrence was the shooter, Rodgers's participation was not minor. In *1225 his May 13 statement, Rodgers admitted that he knew about the plan in advance: "John made a list of the things he would bring, you know. He kind of planned it by himself when I was at home or wherever I was at, and he showed me the list before we even met up with Jennifer and took her out." Rodgers even listed the items contained in the notes, and his recitation of the course of events of the evening conforms to the written plan. The trial court noted that even though Rodgers knew about the plan in advance, he made the date with Robinson anyway and took her to Lawrence's home. Then, together they took her into the woods. Rodgers participated in intoxicating the victim, had sex with her, and after she had been killed, sliced her head. He and Lawrence together placed the body in the back of the truck, drove to a place where they attempted to burn her clothes, and covered the body with debris. In his May 13 statement, Rodgers admitted he was the shooter. In fact, when he was arrested, he was carrying the murder weapon. Given the overwhelming evidence that Rodgers's participation in the murder was far from minor, the exclusion of books and weapons found in a codefendant's home, with no connection whatsoever to Rodgers, even if somehow erroneous, constitutes harmless error.
As to the factor of substantial domination, the court found that Rodgers's "attraction to Jonathan Lawrence and vice versa was their passion for the senseless killing and attempted killing of human beings." The court noted that even under Rodgers's May 10 statement in which he alleged surprise at Lawrence's action, Rodgers claimed he took the gun from Lawrence and considered killing him. Further, in the attempted murder of Smitherman, Rodgers gave the orders; and in the prior murder of Jonathan Livingston he was the first to stab the victim.
I would add that in that same May 10 statement, Rodgers was asked whether Lawrence had previously mentioned the idea of killing Robinson. Rodgers responded, "No, [Lawrence] stopped when I said that, you know, `cause he knew I meant it. He usually listened to me." (Emphasis added.) In fact, Rodgers never suggestedin his statements to his girlfriend, to his brother, or even to police that Lawrence intimidated or coerced him into acting. In both statements to law enforcement officers, Rodgers said that, although he had the gun and expressed his disgust with Lawrence's desecration of Robinson's body, he helped Lawrence put her body in the truck to transport it to another site and helped put her body near a tree. When Lawrence's truck would not start, he and Lawrence walked to a convenience store and called Rodgers's girlfriend. She took them to Lawrence's place; then Rodgers and Lawrence returned to the site where they had left Robinson so they could burn her belongings. Then Lawrence went to work, and Rodgers went home to sleep.
Again, given the scant evidence of Lawrence's domination of Rodgers, and the fact that the books and weapons found in Lawrence's home do not tend to prove that Lawrence dominated him, even if exclusion of the evidence was somehow erroneous, any error was harmless.
The trial court found and gave great weight to two serious aggravating factors: that Rodgers had committed a prior violent felony and that the Robinson murder was cold, calculated, and premeditated (CCP). The prior violent felony aggravator in turn was based on two serious violent felonies: attempted murder and first-degree murder. In fact, the murder of Jennifer Robinson in May 1998 was the *1226 culmination of a three-month spree of violence: they had shot Smitherman on March 29 and murdered Livingston on April 9.[13]
In light of the mitigating evidence presented, and especially in light of the admitted evidence on relative culpability, the excluded evidence would have provided minimal mitigation at best. The court ascribed great weight to the Livingston murder and Smitherman attempted murder and to the CCP aggravator, determining that they "greatly outweigh the mitigating circumstances." Accordingly, I conclude that the failure to admit the evidence was harmless beyond a reasonable doubt. See Douglas v. State, 878 So.2d 1246, 1258 (Fla.2004) (noting that "even if we were to conclude that the trial court erred in rejecting this mitigation, this error would be harmless given the other mitigating evidence considered and weighed by the trial court and the minimal amount of additional mitigation these factors would have provided"), cert. denied, 543 U.S. 1061, 125 S.Ct. 883, 160 L.Ed.2d 790 (2005); Taylor v. State, 855 So.2d 1, 30 (Fla.2003) (stating that "even if the trial judge erred in rejecting this factor as nonmitigating or in failing to assign it any weight, any error would be harmless, given the minimal amount of mitigation this factor would have provided"), cert. denied, 541 U.S. 905, 124 S.Ct. 1605, 158 L.Ed.2d 248 (2004).

III. CONCLUSION
As explained above, the trial court's decision should be affirmed. The evidence that the majority finds so pivotal was irrelevant, and even if deemed relevant, its value as mitigation is minimal. Thus, any error in excluding it was harmless.
QUINCE, J., concurs.
NOTES
[1] Because the murder occurred on property of the United States government, the case was tried in federal court.
[2] Elijah did not meet Rodgers until after their mother, Janelle Rodgers, committed suicide.
[3] The court rejected the following statutory mitigators argued by Rodgers: (1) the capital felony was committed while Rodgers was extremely mentally or emotionally disturbed; (2) he lacked the capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law; (3) Rodgers was an accomplice in the capital felony, which was committed by another person and Rodgers' participation was minor; and (4) he acted under extreme duress or substantial domination of another person.
[4] The court found the following nonspecified statutory mitigators: (1) Rodgers was sexually abused by his mother; he was physically abused by his father; Rodgers' parents abandoned him; his parents abused drugs and alcohol; his family had a legacy of domestic violence; and there was a history of suicide among Rodgers' relatives (considerable weight); (2) at the age of sixteen, Rodgers was incarcerated as an adult and was sexually abused in prison (some weight); and (3) Rodgers suffered from mental illness (considerable and substantial weight).
[5] The nonstatutory mitigators found by the court were: (1) Rodgers had a positive impact on the inmate population (little weight); (2) Rodgers expressed remorse for the murder (some weight); and (3) he provided assistance to officers in solving prior crimes (some weight).
[6] Before accepting the plea, the judge inquired numerous times as to whether Rodgers understood that his plea would still subject him to the same range of punishment as he would face if he continued to a jury trial on the guilt phase (i.e., life imprisonment without the possibility of parole or the death penalty). The judge questioned Rodgers relative to whether Rodgers' attorneys had fully explained the consequences of the plea, whether Rodgers was satisfied with his attorneys' performance, whether Rodgers had ingested any drugs or alcohol within the last twenty-four hours before the plea hearing, whether Rodgers' decision to plead guilty was his own decision, and whether Rodgers believed that the plea was in his own best interest. The judge also fully explained the consequences of the plea, stressed what constitutional rights Rodgers would forfeit if he chose to plead guilty, addressed the conditions to which the State agreed based on the plea agreement, and ensured that Rodgers understood these consequences and conditions.
[7] Spencer v. State, 615 So.2d 688 (Fla.1993).
[8] To the extent that this claim could affect the voluntariness of the plea, we note that during the plea colloquy, Rodgers was asked if he had taken any drugs or alcohol within the last twenty-four hours, and he responded that he had not.
[9] Rodgers pled guilty to principal to first-degree murder, and, in exchange, the State agreed that it would not argue that Rodgers was the actual shooteronly that he and the codefendant were responsible for the death. The State recognized that it was still contested as to who shot the victim. Rodgers initially told four people that Lawrence killed the victim. He then changed his story and told the police that he killed her. On May 13, he told his sister that he falsely took responsibility for killing Robinson because he was trying to kill himself. During the plea colloquy, the court explained to Rodgers that based on his plea, the jury would have to decide during the penalty phase whether they believed that Rodgers was the shooter.
[10] In fact, the sentencing order in Rodgers implies the relevancy of the excluded items. Specifically, when reviewing this very prong in his sentencing order, the trial judge stated: "It is not unusual for people with common interests to associate with one another while not being under their domination or control. In this case, defendant's attraction to Jonathan Lawrence and vice versa was their passion for the senseless killing and attempted killing of human beings." (Emphasis added.) The materials which were excluded specifically showed that Lawrence had a passion for killing and death. The fact that Rodgers did not possess any weapons or books could be used to show that he did not share the same passion or interest and that his involvement was based solely upon his relationship with Lawrence.
[11] The plea agreement stated that Rodgers would plead no contest. At the hearing, however, Rodgers insisted, even after consultation with defense counsel, on pleading guilty to the information as charged.
[12] Another attorney represented Rodgers in his plea.
[13] In his May 13 statement, Rodgers told officers about the Livingston murder. Rodgers explained that Livingston, Lawrence, and he were at Lawrence's house watching Lawrence's relatives repair a truck, when Lawrence signaled that they should kill Livingston. Rodgers shrugged his shoulders to indicate that he "didn't care." After dark they told Livingston that they had some marijuana and drove off in Lawrence's truck to a field, where they stabbed him to death.